Ronald S. Kravitz (SBN 129704)
Kolin C. Tang (SBN 279834)
SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 429-5272
Facsimile: (866) 300-7367
Email: rkravitz@sfmslaw.com
          ktang@sfmslaw.com

*Attorneys for Plaintiff and the Plan*

[Additional Counsel Listed On Signature Page]

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARIA KARLA TERRAZA, Individually and On Behalf of the SAFEWAY 401(K) PLAN, <br><br> Plaintiff, <br><br> v. <br><br> SAFEWAY INC., BENEFIT PLANS COMMITTEE SAFEWAY INC., and DOES NO. 1-10, Whose Names Are Currently Unknown, <br><br> Defendants. | CASE NO. <br><br> **COMPLAINT** <br><br> JURY TRIAL DEMANDED |

## I.   INTRODUCTION

1.    Plaintiff, Maria Karla Terraza ("Plaintiff"), individually and on behalf of the Safeway 401(K) Plan (the "Safeway Plan" or the "Plan"), brings this action under 29 U.S.C. § 1132 on behalf of the Plan against Defendants, Safeway Inc. ("Safeway"), Benefit Plans Committee Safeway Inc. ("Benefit Plans Committee"), and Does No. 1-10, who are the members of the Benefit Plans Committee and whose names are currently unknown (collectively, "Defendants"), for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*

2.    Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (*i.e.,* 401(k) plans), have

COMPLAINT                                   -1-

become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment under-performance.

3.     The importance of defined contribution plans to the United States retirement system has become increasingly pronounced as employer-provided defined benefit ("DB") plans have become increasingly rare as an offered and meaningful employee benefit.

4.     With more than $1.9 billion in assets, the Plan is in the top one percent (1%) of 401(k) plans in terms of assets.  The marketplace for 401(k) retirement plan services is well established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.  Billion dollar defined contribution plans, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of 401(k) plans and the investment of 401(k) assets.  As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants, invest the assets of the Plan in a prudent fashion and ensure that Plan expenses are fair and reasonable.  At all pertinent times, as explained below, Defendants: (a) were fiduciaries under ERISA; (b) breached their fiduciary duties under ERISA by failing to fully disclose to participants the expenses and risks of the Plan's investment options; © breached their fiduciary duties under ERISA by allowing unreasonable expenses to be charged to participants for administration of the Plan; (d) breached their fiduciary duties under ERISA by selecting and retaining opaque, high-cost, and poor-performing investments instead of other available and more prudent alternative investments; and (e) breached their fiduciary duties under ERISA by violating the terms of the Plan.

5.     To remedy these fiduciary breaches and other violations of ERISA, Plaintiff, individually and on behalf of the Plan, brings this action under Section 502, 29 U.S.C. §1132, and Section 409 of ERISA, 29 U.S.C. §1109, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiff seeks such other equitable or remedial relief for

the Plan as the Court may deem appropriate and just under all of the circumstances.

6.     Plaintiff specifically brings this action on behalf of the Plan under ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, to recover the following relief:

- A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan participants;

- Equitable, legal or remedial relief for all losses and/or compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.   THE PARTIES

7.     Plaintiff was a participant under 29 U.S.C. §1002(7) of the Safeway Plan, which is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).  Plaintiff is a resident of Salinas, Monterey County, California.  The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102, and serves as a vehicle for retirement savings and to produce retirement income for employees of Safeway, excluding those employees who are eligible to participate in the Dominick's Finer Foods, LLC 401(k) Plan or the Vons Companies, Inc. Pharmacists' 401(k) Plan of Safeway's subsidiaries and/or affiliates.  Retirement income generated by the Plan depends upon contributions made on behalf of each employee by Safeway, deferrals of employee compensation and employer matching contributions, and from the performance of the Plan's investment options (net of fees and expenses).  Safeway established a trust (the "Master Trust") to hold participant and employer contributions and such other earnings, income and appreciation from Plan investments, less payments made by the Plan's trustee, to carry out the purposes of the Trust, in accordance with 29 U.S.C. § 1103.  As of December 31, 2014, the Plan was one of the country's largest 401(k) plans, with more than $1.9 billion in total assets and over 36,000 participants with account balances.

COMPLAINT                                    -3-

8.      Defendant, Safeway, is a corporation organized and existing under the laws of Delaware, with its principal place of business in Pleasanton, Alameda County, California. Safeway is the Plan sponsor, Plan Administrator, and a designated fiduciary of the Plan and a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002, 1102.

9.      Defendant, Benefit Plans Committee, is a named fiduciary under the Plan, administers the Plan, and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002, 1102.  The Benefit Plans Committee maintains its address at Safeway's headquarters in Pleasanton, Alameda County, California.  The Benefit Plans Committee and its members are appointed by Safeway to administer the Plan on Safeway's behalf.

10.     Defendants, Does 1-10, are the members of the Benefit Plans Committee and, by virtue of their membership, are fiduciaries of the Plan.  Plaintiff is currently unable to determine the membership of the Benefit Plans Committee despite reasonable and diligent efforts because it appears that the current membership of the Benefit Plans Committee is not provided to the public.  As such, the defendants are named Does 1-10 as placeholders.  Plaintiff will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to name the members of the Benefit Plans Committee as defendants as soon as their identities are discovered.

### III.   JURISDICTION AND VENUE

11.     Plaintiff seeks relief on behalf of the Safeway Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under ERISA Section 409, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).

13.     Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Safeway's principal place of business is in this district.  Furthermore, the Benefit Plans Committee is located in this district.

## IV.   FACTUAL ALLEGATIONS

**A.   Background**

**1.   The Safeway Plan Management Structure**

14.   The Safeway Plan is a participant-directed plan in which participants direct their retirement assets into a pre-selected menu of investment offerings consisting of mutual funds, Safeway common stock,[1] common collective trusts, and a stable-value fund.

15.   Pursuant to the Safeway Plan, which was established in 1952 "for the exclusive benefit of [Safeway's] eligible employees," Safeway, as the named and designated plan administrator and fiduciary, appointed the Benefit Plans Committee "to administer the Plan on its behalf." The Benefit Plans Committee is thus delegated with Safeway's "full discretionary authority" to "administer the Plan in accordance with the Plan and ERISA," as well as, among other things, the "full discretionary power and authority:

    i.    To engage actuaries, attorneys, accountants, appraisers, brokers, consultants, administrators, recordkeepers, custodians, physicians, or other firms or persons and (with its officers, directors and employees) to rely upon the reports, advice, opinions or valuations of any such persons except as required by law;

    ii.    To adopt Rules of the Plan that are not inconsistent with the Plan or applicable law and to amend or revoke any such rules;

    iii.    To construe and interpret the Plan and the Rules of the Plan and to remedy any ambiguities and inconsistencies therein;

    iv.    To determine questions of eligibility and vesting of Participants;

    v.    To determine entitlement to allocations of contributions and distributions of Participants, former Participants, Beneficiaries, and all other persons;

    vi.    To make findings of fact as necessary to make any determinations and decisions in the exercise of such discretionary power and authority;

    vii.    To appoint claims and review officials to conduct claims procedures as provided in Section 14.5;

    viii.    To compute, certify to and direct the Trustee with regard to the amount and kind of benefits payable to Participants and their Beneficiaries;

    ix.    To authorize all disbursements by the Trustee from the Trust Fund;

---

[1] The Safeway common stock investment option was eliminated effective January 2015, as explained below.

x.      To maintain all records that may be necessary for the administration of the Plan other than those maintained by the Trustee;

xi.     To delegate any power or duty to any firm or person engaged under paragraph (i) or to any other person or persons; and

xii.    To select or eliminate Investment Funds."

16.     The Safeway Plan's assets are held under the Master Trust.  All investments and asset allocation are performed through the Master Trust.

**2.      The Plan's Investment Offerings**

17.     As of December 31, 2014, the Plan offered the following investment options: mutual funds, separately managed accounts ("SMAs"), Safeway common stock, common collective trusts ("Common Trusts"), and the Interest Income Fund (distinct from the other Common Trusts).

18.     Mutual funds are publicly-traded investment vehicles consisting of a pool of funds collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

19.     SMAs are investment portfolios that begin with the same allocation as that of their mutual fund counterpart, but for which the professional investment adviser will make individual investment decisions that may depart from that of the mutual fund.  In essence, SMAs are mutual funds customized for that investor.  However, unlike mutual funds, SMAs do not issue registered prospectuses and, as such, their fees and other disclosures are not as transparent.

20.      The Safeway common stock investment option was eliminated from the Plan effective January 30, 2015, and the stock was liquidated due to a merger with Albertsons Companies Inc., another grocery company.

21.     Common Trusts are, in essence, mutual funds without the SEC regulation.  Common Trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments.  Common Trusts were first organized under

state law in 1927, and were blamed for the market crash in 1929.  As a result, Common Trusts were severely restricted, giving rise to the more transparent and publicly-trade mutual funds. Today, banks create Common Trusts only for their trust clients and for employee benefit plans like the Plan.  The main advantage of opting for a Common Trust, rather than a mutual fund, is the negotiability of the fees, so larger retirement plans are able to leverage their size for lower fees.

22.     The Interest Income Fund is the Plan's stable value fund, which is a capital preservation investment option that uses a Common Trust as its investment vehicle.  The Interest Income Fund invests in a mutual fund, a separate account contract, and traditional and synthetic Guaranteed Investment Contracts ("GICs").

**3.      Limited Scope Audit In 2014**

23.     The Plan's 2013 and 2014 financial statements ("2013-2014 Financials"),[2] which were the most recent financial statements provided to Plaintiff and other Plan participants, indicated that Deloitte & Touche LLP ("Deloitte"), the Plan's auditor, performed only a limited scope audit of the Plan's financial statements for 2014.  In other words, Deloitte was unable to obtain sufficient audit evidence to provide a basis for an audit opinion on the 2014 financial statements.

24.     According to the "Basis for Disclaimer of Opinion" in the 2013-2014 Financials, the Plan administrator (*i.e.*, Safeway, through the Benefit Plans Committee) instructed Deloitte not to perform any audit procedures with respect to information certified by the Safeway Plan's service provider, as agent for the trustee of the Plan, except for comparing such information with the related information included in the 2014 financial statements.  Defendants represented that they obtained a certification from the trustee that the information Defendants received from the trustee was complete and accurate.  As such, Deloitte did not express an opinion of the 2014 financial statements or the supplemental schedule of assets.

---

[2]*Financial Statements as of and for the Years Ended December 31, 2014 and 2013, Supplemental Schedule as of December 31, 2014, and Independent Auditor's Report*, Safeway 401(k) Plan, July 31, 2015, is attached hereto as Exhibit "A."

25.     Apparently, Deloitte did perform a full audit of the Plan's 2013 financial statements.  It appears that the Plan moved from a full audit in 2013 to a limited scope audit ("LSA") in 2014, for some undisclosed reason.

26.     ERISA allows plan administrators to engage Certified Public Accountants to perform LSAs.  However, many commentators, including the Department of Labor ("DOL") Inspector General, have criticized LSAs "as a major obstacle in providing audit protections for plan participants."  For decades, the DOL Inspector General has sought repeal of the LSA exemption in ERISA.  *See* http://www.oig.dol.gov/public/reports/oa/2012/09-12-002-12-121.pdf.

27.     When an auditor is engaged to perform a full-scope audit, everything in the plan is subject to audit testing.  However, when performing an LSA of the financial statements, the auditor need not perform any auditing procedures with respect to investment information prepared and certified by a qualified bank or similar institution, or by an insurance carrier.  To be qualified, a bank or insurance carrier must act as a trustee or custodian for the plan, be state or federally chartered and be regulated, supervised and subject to periodic examination by a state or federal agency.   Additionally, the trustee or custodian must certify as to the accuracy and completeness of the investment information.

28.     LSAs are especially risky (and likely inappropriate) where the trustee is certifying non-publicly traded investments, such as collective trusts and SMAs, which consist of the majority of the assets in the Safeway Plan.  And, it is worse still, where, as here, the trustee is certifying the values of its own proprietary funds that are not publicly traded.

29.     In short, as discussed below, virtually all investment balances and investment information are unaudited.

**B.      Defendants' Breaches Of Fiduciary Duty**

30.     Defendants have severely mismanaged the Plan in a myriad of ways detailed below.  Defendants' failure to monitor the investments in the Plan to ensure that they provided adequate available returns and were not excessively priced, as were the vast majority of the investments in the Plan, constituted breaches of fiduciary duty.  Indeed, the Safeway Plan is a significantly expensive plan in terms of total plan cost when compared to defined contribution

retirement plans of a similar size.

31.     At all pertinent times, Safeway and the Benefit Plans Committee were responsible for selecting and monitoring the investments.  Defendants breached their fiduciary duties by imprudently failing to monitor the fees charged directly and indirectly to the Plan and its participants, and by failing to ensure that such fees were fair and reasonable under all of the circumstances.

32.     At all pertinent times, the Benefit Plans Committee and Safeway were responsible for offering prudent and sound advice with respect to the investments offered to participants of the Plan in the sole interest of the Plan participants, disclose necessary information such that the Plan participants could make informed decisions, and to ensure that the fees and expenses charged with respect to these investments were fair and reasonable.  Defendants breached those fiduciary duties.

33.     At all pertinent times, Defendants were legally responsible for monitoring the advice and services provided by the Plan's service providers.  In light of the apparent breaches of fiduciary duty in terms of both poor investment options, blatantly excessive fees, and undisclosed conflicts and fees, it is apparent that Defendants all breached those fiduciary duties.

**1.     Overwhelming Majority Of Unregistered Investment Options Lacking Prospectuses**

34.     As of December 31, 2014, the Plan's Common Trusts investment options were the following:

Retirement Income

i.      JPMCB SmartRetirement Passive Blend Income-C20

ii.     JPMCB SmartRetirement Passive Blend 2015-C20

iii.    JPMCB SmartRetirement Passive Blend 2020-C20

iv.     JPMCB SmartRetirement Passive Blend 2025-C20

v.      JPMCB SmartRetirement Passive Blend 2030-C20

vi.     JPMCB SmartRetirement Passive Blend 2035-C20

vii.    JPMCB SmartRetirement Passive Blend 2045-C20

COMPLAINT                                    -9-

viii.    JPMCB SmartRetirement Passive Blend 2050-C20

Stocks-Large Blend

ix.    SSgA S&P 500 Index NL-A

35.    As of December 31, 2014, the Plan's mutual fund investment options were the following:

Stocks-Large Value

i.    Dodge & Cox Stock (DODGX)

Stocks-Large Growth

ii.    Wells Fargo Advantage Large Cap Growth-Inst (STNFX)

Stocks-Small Growth

iii.    Emerald Growth-Inst (FGROX)

Foreign Large Growth

iv.    American Funds EuroPacific Growth-R5

36.    As of December 31, 2014, the Plan's SMA options were the following:

Bonds

i.    PIMCO Bond Fund

Stocks-Small Growth

ii.    RS Small Cap Value Portfolio

37.    As indicated above, excluding Safeway common stock, nine of the 15 riskier investment options were opaque Common Trust vehicles,[3] with two of the remaining six options non-transparent SMAs.[4]  In all, only four of the 16 options were mutual funds.  And, even discounting the Retirement Income investment options, half of the remaining six stock or bond investment options were either SMAs or Common Trusts.  Moreover, the Retirement Income

---

[3]As discussed above, *supra* Section IV.A.2, Common Trusts are not required to file a prospectus or registration statement with the SEC.

[4]As discussed above, *supra* Section IV.A.2, an SMA, while identical to a mutual fund in its initial disposition, varies its investment portfolio as time progresses.  No prospectus or registration statement is filed for the SMA, which means that there are no regular reports as to the current allocation of the SMA's investment portfolio.

investment options (*i.e.*, the JPMCB SmartRetirement Passive Common Trusts) are the default for the Plan, which pushes Plan participants to place their retirement assets with those investment vehicles.

38.     Naturally, this skewed investment option selection translated into the Master Trust's allocation of Plan assets as well.  As of December 31, 2014, over *a third* of the Plan's $1.9 billion in assets were placed in the opaque Common Trusts and over *48%* were placed in Common Trusts or SMAs, not including the Common Trusts within the Interest Income Fund:

- Mutual Funds:                                                    $442.5 million
- SMAs:                                                                  $284.7 million
- Safeway Common Stock:                                   $195.6 million
- Common Trusts (outside of Interest Income Fund):    $659.3 million
- Interest Income Fund:                                        $417.7 million

39.     And, of the Plan assets in the Common Trusts, $244.8 million was placed in the default Retirement Income investment options  (*i.e.*, the JPMCB SmartRetirement Passive Common Trusts), which is very opaque, as discussed further below.

**2.     Undisclosed Expenses, Fees, And Risks**

40.     The Plan's predisposition for unregistered and opaque investment options matches the lack of disclosures of information material to Plan participants, which is indicative of Defendants' approach to their fiduciary duties.  This lack of clarity renders a determination of the true and full nature of the expenses or fees being charged and incurred nearly impossible, and precludes participants from making informed decisions regarding their investments.

41.     *Administrative Expenses And Expense Reimbursement.*  According to the 2013-2014 Financials, "[p]ayment for Plan administrative expenses is paid in part by the investment funds based on revenue sharing agreements between the Plan and the investment funds." *See* Ex. A, at 6.  In the retirement plan industry, revenue share agreements are very rarely between the plan and the investment funds.  Instead, these agreements are almost always between the recordkeeper and the investment funds, which is reflected by a later disclosure in the 2013-2014 Financials that the recordkeeper, "or one or more of its affiliates, may receive a fee from the

COMPLAINT                                     -11-

1    investment option provider for providing certain recordkeeping, distribution and administrative

2    services."

3          42.     In addition, while the 2013-2014 Financials first note that "participants are

4    charged up to $4.00 per month," with the "benefit [of the revenue sharing agreements] to which a

5    participant is entitled is the value of the participant's vested account," the 2013-2014 Financials

6    then provides that, "[p]articiants are charged $3.00 quarterly to cover the administrative costs of

7    the [P]lan."  In other words, it appears that administrative expenses are primarily allocated to

8    participant accounts, and notwithstanding the language that a participant's responsibility for

9    administrative expenses is offset by the "value of the participant's vested account" through the

10   "revenue sharing agreements between the Plan and the investment funds," it appears that the

11   participant's responsibility is actually fixed.

12         43.     *Revenue Sharing.*  While the 2013-2014 Financials provide in the "Participant

13   Disclosure Notice" that "each investment has a fee associated with it to cover the cost of

14   managing the investments," that notice fails to disclose that certain portions of those investment

15   fees may be paid to the recordkeeper or the trustee as revenue sharing.  Indeed, as described

16   below, certain of those arrangements -- *i.e.*, those involving the SSgA S&P 500 Index NL-A

17   Common Trust and the Interest Income Fund -- are expressly provided for in the Master Trust,

18   which is discussed below.

19         44.     *SSgA S&P 500 Index NL-A Common Trust.*  The Master Trust provides that,

20   with respect to the SSgA S&P 500 Index NL-A Common Trust, the trustee is to assess an annual

21   fee of 15 basis points (.15%), of which only 2 basis points (.02%) go to the Common Trust fund

22   manager as compensation, with the remainder to be divided under a formula between the trustee

23   and the recordkeeper, as compensation for the trustee's calculation of the daily unit price and

24   investment performance for the Common Trust and for the recordkeeper's services pursuant to its

25   service agreement with Safeway.  The 2013-2014 Financials do not disclose the amount of

26   revenue sharing, precluding participants from making an informed decision when choosing this

27   investment option.  Moreover, the nature of the fees paid to the trustee and the recordkeeper are

28   grossly excessive under the circumstances.

COMPLAINT                          -12-

45. ***Interest Income Fund.*** The 2013-2014 Financials describes the constitution of the Interest Income Fund -- JPM U.S. Treasury Plus Money Market Fund, separate account contract, and traditional and synthetic GICs – and disclose that it is managed by Dwight Asset Management Company ("Dwight"), a wholly-owned subsidiary of Goldman Sachs. *See* Ex. A, at 15-17, 28. The 2013-2014 Financials also disclose that the gross expense ratio is 25 basis points (.25%),[5] but fails to disclose additional fees relating to the Interest Income Fund, including the separate account contract charges and similar fees.

46. The Master Trust also reveals that of the 25 basis points (.25%) assessed, 8 basis points (.08%) go to Dwight as compensation for asset management services, with the remainder to be divided under a formula between the trustee and recordkeeper, as compensation for the trustee's calculation of the daily unit price and investment performance for the Common Trust and for the recordkeeper's services pursuant to its service agreement with Safeway. Again, the 2013-2014 Financials do not disclose this arrangement, precluding participants from making an informed decision when choosing this investment option. Moreover, the nature of the fees paid to the trustee and the recordkeeper are grossly excessive under the circumstances.

47. ***Exempt Party-In-Interest Transactions.*** According to the 2013-2014 Financials:

Certain Plan investments are managed or ***significantly influenced*** by J.P. Morgan Chase Bank N.A., trustee of the Plan. As J.P. Morgan Retirement Plan Services provides recordkeeping services to the Plan, these transactions quality as party-in-interest transactions until the third quarter 2014 acquisition of JP Morgan Retirement Plan Services by Great West Financial® (see Note 1). Administrative fees paid to J.P. Morgan Retirement Plan Services for recordkeeping were $759,556 in 2014 and $1,144,220 in 2013.

48. While it is clear that the JPMCB SmartRetirement Passive Blend Common Trusts are managed by JPMCB, the exact nature, extent, and identity of investment options "significantly influenced" by JPMCB is unclear, and it appears that the relationship and influence inappropriately affects and compromises the Plan's investment options.

---

[5]The "expense ratio" is the annual fee that all funds or ETFs charge their shareholders. It expresses the percentage of assets deducted each fiscal year for fund expenses, including 12b-1 fees, management fees, administrative fees, operating costs, and all other asset-based costs incurred by the fund.

COMPLAINT                            -13-

49.     ***JPMCB SmartRetirement Passive Common Trusts.***  Even though the JPMCB SmartRetirement Passive Common Trusts are called "Passive," these Common Trusts combine both actively managed and indexed strategies, which is misleading to participants who prefer passive management.  The proper name should be "Passive/Active."

50.     Further, there does not appear to be any guideline specifying the percentage of assets that will be passively managed, nor does there appear to be any guideline regarding the percentage of assets in these funds of funds that will be invested in JPMCB-affiliated funds versus funds maintained by unaffiliated banks and trust companies.  However, the 12/31/15 Fact Sheets, which are available online, disclose that, for example: the 2020 Common Trust was 45% invested in Northern Trust Index funds and 55% apparently in JPMCB-affiliated funds; the 2030 Common Trust was 60% invested in Northern Trust Index funds and 40% in JPMCB-affiliated funds; and the 2050 Common Trust was 72% invested in Northern Trust Index Funds and 28% apparently invested in JPMCB-affiliated funds.

51.     The exact expense ratios for these Common Trusts are also unclear.  The gross expense ratios of these Common Trusts (.47%-.50%) included in the Default Notice section of the 2013-2014 Financials are noted as, the "funds' total annual operating expense ratios, gross of any fee waivers or expense reimbursements."  The Default Notice section also provides, in an endnote, that the "JPMCB SmartRetirement Funds indirectly bears its proportionate share of the operating expenses of any underlying funds in which it may invest (excluding management fees and services fees) . . . "the Trustee of the JPMCB SmartRetirement Funds agrees to reimburse the Fund for such fund operating expenses . . . [to the extent they] exceed 0.04%."  And, the disclosed fees are grossly excessive in light of the size and bargaining power of the Plan.

52.     According to public information available from JPMCB online:

When you select a SmartRetirement Passive Blend Fund, you're automatically invested in more than 15 underlying funds across two asset classes - stocks and bonds.  By investing in the fund, a team of more than 100 investment professionals at J.P. Morgan is responsible for shifting the allocation from stocks to bonds as the fund approaches its target date. This way your fund automatically changes to become more conservative as you approach your target retirement date.

https://www.jpmorgansmartretirement.com/passiveblend/SR2030.  However, JPMCB then goes

COMPLAINT                              -14-

on to warn that, "the gross expense ratio of the fund includes the *estimated* fees and expenses of the underlying funds. *There may be additional fees associated with investing in a Fund of Funds strategy*." *Id.* (emphasis added).

53.     These "additional fees" associated with a fund of funds, especially with one managed by JPMCB, may be significant.  Without a prospectus or a complete audit, the actual, rather than estimated, total expense ratio is unavailable.  Thus, it is impossible to determine the true nature of the fees and expenses, which are grossly excessive on their face.

54.     ***Concentration Of Risk.***  The Plan's financial statements for the year ended December 31, 2014 disclosed a "Concentration of Risk" wherein the Master Trust's investments included a mutual fund with a year-end fair value of $157.3 million, of which the Master Trust held a 65.2% beneficial ownership of the outstanding institutional shares.  The identity of this mutual fund is, however, undisclosed and indiscernible based on the information provided in the financial statements.  As a result, it is impossible to determine if inclusion of that mutual fund unbalances the risk allocation of the Plan's investment options as a whole, and participants are not fully informed of that investment option's risk.

55.     ***The Safeway Common Stock Fund.***  There is no information regarding Safeway's common stock fund, such as whether an investment manager was appointed, the use or availability of short-term holdings (*e.g.*, percentage of cash in the JPMCB money market fund), performance (inclusive of any cash drag/bump on stock performance), or fee information.  Without that information, it was impossible for participants to properly scrutinize the integrity of this investment option.

56.     ***Inaccurate Form 5500.***  Form 5500 is "a disclosure document for plan participants and beneficiaries." The Safeway Plan's 2014 Form 5500 failed to disclose that JPMCB received approximately $27,000 in indirect compensation and the fund manager for the SSgA S&P 500 Index NL-A Common Trust received approximately $73,000 in indirect compensation.

**3.     The Underperformance And Excessive Fees Of The Investment Options**

57.     Notwithstanding the lack of transparency of the selection of investment options

and general lack of disclosures, which makes scrutiny of the true and full nature of fees and expenses, as well as investment options, virtually impossible, the information that is available indicates that the Plan and its participants are required to pay excessive fees for the mutual funds and other investment options.  These fees are, on their face, unreasonable in many instances and often are multiples higher than the amounts they should be (when compared to the expense ratios that would be associated with typical mutual fund share classes held in retirement plans assets of the same or similar size of the Safeway Plan), based upon the market and negotiating power of the Plan.  As indicated below, almost all of the investment options either underperformed compared to their benchmark, are significantly more expensive than their Vanguard peers, or both.

58.    ***The PIMCO Bond Fund SMA.***  The PIMCO Bond Fund SMA not only underperformed relative to its benchmark, but was more expensive relative to its peer.  For the year ended December 31, 2014, the PIMCO Bond Fund had a 1.64% return rate, significantly lower than the Barclays Capital U.S. Aggregate Bond Index (BarCap US Agg Bond) benchmark of 2.02% for the same period.  During the same period, the PIMCO Bond Fund charged an expense ratio of 46 basis points (0.46%), while expense ratio for Admiral Shares of the Vanguard Total Bond Market Index Fund, which tracks the BarCap US Agg Bond, was 7 basis points (.07%).  In other words, despite its underperformance, the PIMCO Bond Fund charged 39 basis points (0.39%), or six times ***more*** than its peer, the Vanguard Total Bond Market Index Fund.

59.    ***The JPMCB SmartRetirement Passive Blend Common Trusts.***  Of the eight JPMCB SmartRetirement Passive Blend Common Trusts presented to Plan participants, only one – the JPMCB SmartRetirement Passive Blend Income – has outperformed its benchmark since inception.  Meanwhile, their expense ratios range from 47 basis points (.47%) to 50 basis points (.50%), which is significantly higher than their Vanguard counterparts that had an average expense ratio of 17 basis points (.17%) as of December 31, 2014, and higher than the industry average of 43 basis points (.43%).

60.    Moreover, the Plan's share class for the JPMCB SmartRetirement Passive Blend Common Trusts was not even the least expensive.  The Plan offered the C20 share class, which,

as of March 31, 2016, had an expense ratio of either 45 or 46 basis points (.45% or .46%).  This is significantly higher than the other two classes: the CF share class charged either 25 or 26 basis points (.25% or .26%), while the CF10 class charged either 35 or 36 basis points (.35% or .36%).  In other words, on top of the fact that the JPMCB SmartRetirement Passive Blend Common Trusts are objectively overpriced, Defendants did not even secure the least expensive share class available despite the Safeway Plan's size and the investment options' role as the default investment.

61.   ***The Dodge & Cox Stock Mutual Fund (DODGX).***  Despite an expense ratio of 52 basis points (.52%), as of December 31, 2014, this mutual fund only outperformed the S&P 500 in the three- and five-year benchmark.  Moreover, the .13% differential between the five-year bench mark – 15.57% return as opposed to the S&P 500's 15.46% return – is mooted by the expense ratio, which would make the actual 15.05% return on this mutual fund lower than the S&P 500's return.  Meanwhile, the expense ratios of comparable Vanguard mutual funds are much lower, ranging from 16 basis points (.16%) (Vanguard High Dividend Yield Index Fund Investor Shares), 17 basis points (.17%) (Vanguard Equity Income Fund Admiral Shares), 26 basis points (.26%) (Vanguard U.S. Value Fund and Vanguard Windsor II Fund Admiral Shares), to 29 basis points (.29%) (Vanguard Windsor Fund Admiral Shares).

62.   ***The SSgA S&P 500 Index NL-A Common Trust.***  This Common Trust is the only index option available to the Plan, yet still somehow underperformed the S&P 500 for every benchmark year, with a dramatic 87 basis points (.87%) for the 10-year/inception benchmark.  Meanwhile, its expense ratio of 16 basis points (.16%), is more than three times more than that of the 5 basis points (.05%) expense ratio for Vanguard 500 Index Fund Admiral Shares, which more closely tracks the S&P 500.

63.   Moreover, the Common Trust's mutual fund counterpart, SsgA S&P 500 Index Fund, tracked the S&P 500 more closely than the Common Trust while levying an expense ratio of 15 basis points (.15%), which is lower than that of the Common Trust.  These facts suggest either (a) the performance quoted to the Plan's participants in the 2013-2014 Financials is wrong; (b) an additional fee has been imposed on the Common Trust, which reduced the past net

performance; or © the Common Trust was mismanaged.

64.     ***Wells Fargo Advantage Large Cap Growth-Inst Mutual Fund (STNFX).***  This mutual fund underperformed every period compared to its benchmark.  Meanwhile, with an expense ratio of 79 basis points (.79%), this mutual fund charged approximately 70 basis points (.70%) more than its Vanguard counterpart, the Vanguard Growth Index Fund Admiral Shares, which had an expense ratio of 9 basis points (.09%) for that same period.

65.     ***RS Small Cap Value Portfolio SMA.***  This SMA significantly underperformed compared to its benchmark, having a -2.29% return, while the Russell 2000 Value benchmark had a return of 4.44%.  Meanwhile, with an expense ratio of 89 basis points (.89%), this SMA charged approximately 80 basis points (.80%) more than its Vanguard counterpart, the Vanguard Small Cap Value Index Fund Admiral Shares, which had an expense ratio of 9 basis points (.09%) for that same period.

### 4.     JPMCB's Conflicted Roles

66.     Under the Master Trust, JPMCB (or the current trustee) determines the value of the Common Trust assets held in the Master Trust based upon the value stated by the trustee of the Common Trust, *i.e.*, JPMCB (or the current trustee).  In other words, Defendants tasked the trustee with confirming the value of its own Common Trusts, an obviously profound conflict-of-interest which is especially dangerous, as these Common Trusts are unregistered and not publicly-traded.

67.     Indeed, as the Common Trusts are unregistered and not publicly-traded and the audit scope is limited, it is impossible to independently determine if the trustee overvalued the Common Trusts for its own benefit.

### 5.     Violation Of Plan Documents

68.     The 2005 Restatement of the Safeway 401(k) Plan, effective January 2005 ("2005 Restatement"), is the operative Plan operations instrument.  Appendix A to the Restatement lists the investment options offered to participants and beneficiaries in Appendix A.  The 24th Amendment, dated August 27, 2014, provides the revised list of investment options offered:

COMPLAINT                              -18-

## I.   Investment Funds Available

The Investment Funds offered to Participants and Beneficiaries include this set of funds:

Interest Income Fund
PIMCO Total Return Fund
Dodge & Cox Stock Fund
Wells Fargo Advantage Large Cap Growth Fund
RS Partners Fund
American Funds EuroPacific Growth
Emerald Growth Fund

69.   As illustrated above, the list does not include the JPMCB SmartRetirement Passive Blend Common Trusts.  Accordingly, providing those Common Trusts appears to violate the provisions of the 2005 Restatement.

## V.   ERISA'S FIDUCIARY STANDARDS

70.   ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  29 U.S.C. §1104(a), states, in relevant part, as follows:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -

(A)   for the exclusive purpose of

(i)   providing benefits to participants and their beneficiaries; and

(ii)   defraying reasonable expenses of administering the plan;

[and]

(B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

71.   Under 29 U.S.C. 1103(c)(l), with certain exceptions not relevant here,

the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

72.   Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

73.   ERISA's fiduciary duties are "the highest known to the law" and must be done

COMPLAINT                           -19-

"with an eye single" to the interests of participants.

74.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

75.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.  Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

76.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually, on behalf of the Plan, to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

## COUNT I
### (For Breach Of Fiduciary Duty)

77.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

COMPLAINT                                    -20-

78.     Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A),(B) and ©, in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and © by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

79.     As a direct result of Defendants' breaches of duties, Plaintiff and the Plan have suffered losses and damages.

80.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)

81.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

82.     In the alternative, to the extent that any of the Defendants is not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant is liable to Plaintiff and the Plan for all recoverable damages and relief as a non-fiduciary that knowingly participated in a breach of trust.

WHEREFORE, Plaintiff, on behalf of herself and the Plan, demands judgment against Defendants, for the following relief:

COMPLAINT                            -21-

1     (a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as

2  detailed above;

3     (b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for

4  restitution and/or damages as set forth above, plus all other equitable or remedial relief as the

5  Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

6     (c)     Pre-judgment and post-judgment interest at the maximum permissible rates,

7  whether at law or in equity;

8     (d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

9     (e)     Such further and additional relief to which Plaintiff and the Plan may be justly

10  entitled and the Court deems appropriate and just under all of the circumstances.

11  **DEMAND FOR JURY TRIAL**

12     Plaintiff hereby demands trial by jury as to all claims so triable.

13  **NOTICE PURSUANT TO ERISA § 502(h)**

14     To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the

15  undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was

16  served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return

17  receipt requested.

18  Dated: July 14, 2016         Respectfully submitted,

19                     SHEPHERD, FINKELMAN, MILLER

20                      & SHAH, LLP

21                     /s/ Kolin C. Tang
                        Ronald S. Kravitz (SBN 129704)

22                     Kolin C. Tang (SBN 279834)
                        Shepherd Finkelman Miller

23                     & Shah, LLP
                        One California Street, Suite 900

24                     San Francisco, CA 94111
                        Telephone: (415) 429-5272

25                     Facsimile: (866) 300-7367
                        Email: rkravitz@sfmslaw.com

26                            ktang@sfmslaw.com

27

28

COMPLAINT               -22-

James E. Miller
Laurie Rubinow
Shepherd Finkelman Miller
 & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
          lrubinow@sfmslaw.com

Nathan Zipperian
Shepherd Finkelman Miller
 & Shah, LLP
1625 N. Commerce Pkwy, Suite 320
Fort Lauderdale, FL 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
Email: nzipperian@sfmslaw.com

Sahag Majarian
Law Offices of Sahag Majarian
18250 Ventura Blvd.
Tarzana, CA 91356
Telephone: (818) 609-0807
Facsimile:  (818) 609-0892
Email: sahagii@aol.com

***Attorneys for Plaintiff
and the Plan***