1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    MARIA KARLA TERRAZA,                    Case No.16-cv-03994-JST

8               Plaintiff,

9        v.                                  **ORDER DENYING MOTION TO DISMISS**

10   SAFEWAY INC., et al.,                   Re: ECF No. 46

11              Defendants.

12          Before the Court is Defendant's motion to dismiss pursuant to Rule 12(b)(6) of the Federal

13   Rules of Civil Procedure.  ECF No. 46.  The Court will deny the motion.

14   **I.     BACKGROUND**

15          For the purpose of deciding this motion, the Court accepts as true the following allegations

16   from Plaintiff's First Amended Complaint, ECF No. 37.  See Navarro v. Block, 250 F.3d 729, 732

17   (9th Cir. 2001).

18          **A.  Parties**

19          Plaintiff Maria Karla Terraza was a participant in Safeway's 401(k) plan ("the Plan").

20   ECF No. 37 ¶ 7.  Defendants Safeway, Inc. and Safeway Benefit Plans Committee (collectively

21   "Safeway Defendants") sponsor and administer the Plan, respectively.  Id. ¶¶ 8-9.  Defendants,

22   Does 1-10, are members of the Benefit Plans Committee.  Id. ¶ 10.

23          **B.  Recordkeepers**

24          JP Morgan Retirement Plan Services was the record-keeper for the Plan until September

25   2014.  ECF No. 54-1 at 8.  At that point, Great-West Financial RPS LLC d/b/a Empower

26   Retirement ("Great-West") acquired JP Morgan Retirement Plan Services and began to provide

27   recordkeeping services to the Plan.  ECF No. 54-1 at 20.  In July 2016, Vanguard became the new

28   record-keeper for the Plan.  ECF No. 47-16.

United States District Court
Northern District of California

### C.  Master Services Agreement

Pursuant to the master services agreement, which was executed in January 2009, the Plan agreed to compensate the record-keeper through a "Contingent Per Participant Fee" of $67 per year.  ECF No. 47-17 at 22.  This fee was lowered to $65 per year in 2011.  ECF No. 47-18 (amendment to master services agreement).

Under this arrangement, the record-keeper would initially receive a percentage of the fees charged for each investment as a credit toward record-keeping services.  ECF No. 47-17 at 22, 30.[1] If the service fees that the record-keeper received for a particular quarter fell below one-quarter of the annual per-participant fee, Safeway was required to "make a lump sum payment to [the record-keeper] … in an amount equal to the difference between the foregoing amount and the amount of the actual annual service fees received by [the record-keeper]."  Id. at 22.  Conversely, "[i]n the event the annual service fees received by [the record-keeper] exceed $65.00 per Participant at the end of the Plan Year, [the record-keeper] shall accumulate accruals under the Plan Expense Arrangement ("PEA") in accordance with the terms and conditions of the PEA Addendum to the Agreement."   ECF No. 47-18 at 2-3; see also ECF No. 47-17 at 42 ("Accruals will be calculated and attributed to the PEA at the end of each calendar quarter for all service fees received by [the record-keeper] related to . . . investments in the Plan in excess of the applicable Contingent Per Participant Fee . . .").

The excess funds in the PEA account, which was created and maintained by the record-keeper, could only be used at the direction of the Safeway Defendants to reasonably compensate third-party service providers, in accordance with ERISA.  ECF No. 47-17 at 38-40.  The PEA addendum provides that any accruals in the PEA account "expire at 3:00 p.m. Central Time on the last business day, as determined by JPMorgan RPS, of each subsequent Plan Year, or upon the termination of the Agreement or this Addendum."  ECF No. 47-17 at 38.  The addendum does not explain what happens to the expired funds.  See id.

---

[1] Where a record-keeper recovers administrative costs from Plan participants in this way—that is, by assessing asset-based fees against the various investment options—it is sometimes referred to as asset-based revenue sharing.  White v. Chevron Corp., No. 16-CV-0793-PJH, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016).

United States District Court
Northern District of California

The Defendants and the record-keeper entered into an amendment on November 1, 2013 to create an "ERISA spending account" to replace the PEA.  ECF No. 47-19 at 2.  Pursuant to that amendment, if revenue-sharing fees exceed the annual per-participant fee at the end of the year they will be attributed to the ERISA spending account.  Id.  The ERISA spending account addendum materially differs from its PEA predecessor because (1) the accruals do not expire and (2) it provides that "[i]n the event Plan Sponsor does not exhaust the Account for a given calendar quarter, Plan Sponsor may allocate such eligible unused amounts, held in the Account to Participant accounts."  Id. at 5.

### D.  The Plan's Investment Options

During the relevant time period, the Plan offered a menu of between eighteen and twenty-two investment options to help eligible Safeway employees save for retirement.  ECF No. 37 ¶¶ 14, 18.  Those options consisted of mutual funds, separately managed accounts, Safeway common stock,[2] common collective trusts, and a stable value fund.

According to Terraza's complaint, "[m]utual funds are publicly-traded investment vehicles consisting of a pool of funds collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities."  Id. ¶ 19.  In addition, because mutual funds are registered with the Securities and Exchange Commission ("SEC"), they "are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus."  Id.  As of December 31, 2014, four of the Plan's sixteen investment options were mutual funds.  Id. ¶¶ 36-39.

Unlike mutual funds, which are pooled, separately managed accounts ("SMAs") offer a portfolio of assets that is unique to the individual investor and that is managed by a professional investment firm.  Investopedia, http://www.investopedia.com/articles/mutualfund/08/managed-separate-account.asp.  Although these investment firms operate under the purview of the SEC, SMAs do not issue registered prospectuses.  Id.  As of December 31, 2014, two of the Plan's sixteen investment options were SMAs.  ECF No. 37 ¶ 36-39.

---

[2] The Plan stopped offering Safeway common stock as an investment option on January 30, 2015. Id. ¶ 21.

United States District Court
Northern District of California

Common trusts, which are operated by banks or trust companies, "group assets from individuals and organizations to develop a larger, diversified portfolio." Investopedia, http://www.investopedia.com/terms/c/collective-investment-fund.asp. "The primary objective of a collective fund is, through economies of scale, to lower costs with a combination of profit-sharing funds and pensions." Id. "By combining different fiduciary assets in a single account, the bank is typically able to substantially decrease its operational and administrative expenses." Id. Common trusts, like SMAs, are not subject to SEC regulation. Id. As of December 31, 2014, nine of the Plan's sixteen investment options were common trusts, and "over *a third* of the Plan's $1.9 billion in assets were placed in the opaque Common Trusts." ECF No. 37 ¶ 36-39, 42 (emphasis in original). When combined, common trusts and SMAs accounted for over forty-eight percent of the Plan's assets as of December 31, 2014. Id. ¶ 42. The Plan's default retirement investment options, the JP Morgan Chase Bank target date funds, were common trusts. Id. ¶ 43; ECF No. 47-13 at 12.

Lastly, the Plan offered the Interest Income Fund, which is a stable value fund. ECF No. 37 ¶ 23. A stable value fund is "a managed portfolio of highly rated corporate or government, short-term and intermediate-term bonds with a principal protection wrapper provided by a life insurance company." Investopedia, http://www.investopedia.com/terms/s/stable-value-fund.asp.

### E. Participant Disclosure Notices

The Plan provided Participant Disclosure Notices to Plan participants throughout the relevant time period. ECF Nos. 47-10, 47-11, 47-12, 47-13, 47-14.

Those notices disclose that "[e]ach investment has a fee associated with it to cover the cost of managing the investments." ECF No. 47-13 at 5. They go on to explain that "[t]he fee is generally taken as a percentage of money invested and is shown as a gross expense ratio," which "is shown as a percentage of assets in the fund and reduces the rate of return of the fund." Id. The notices explain that "[t]hese fees cover the cost of administering and servicing the plan, which could include recordkeeping, auditing, legal and trustee/custodial expenses." Id. The notices also provide that "J.P. Morgan Retirement Plan Services LLC and its affiliates and agents may receive compensation with respect to plan investments, including, but not limited to, sub-transfer agent,

recordkeeper, shareholder servicing, 12b-1 or other revenue-sharing fees." ECF No. 47-10 at 5; see also ECF No. 47-13 at 13 ("GWFS Equities, Inc., or one or more of its affiliates, including Great-West Financial Retirement Plan Services, LLC, may receive a fee from the investment option provider for providing certain recordkeeping, distribution and administrative services."). The notices list the gross expense ratio next to each individual investment option. See, e.g., ECF No. 47-13 at 7-9. During the relevant time period, the expense ratios for all of the Plan's investment options ranged from .15 − 1.42. See ECF Nos. 47-10, 47-11, 47-12, 47-13, 47-14.

### F. 2013-2014 Financial Statement

According to the 2013-2014 financial statement for the Plan, "[p]ayment for Plan administrative expenses is paid in part by the investment funds based on revenue sharing agreements between the Plan and the investment funds." Id. That statement discloses the amount of administrative fees paid to JP Morgan Retirement Plan Services for its recordkeeping services as $759,556 in 2014 and $1,144,220 in 2013. ECF No. 54-1 at 20.

The 2013-2014 financial statement also discloses that "[t]he Master Trust investments at December 31, 2014, include a mutual fund with a year-end fair value of $157.3 million that the Master Trust has a 65.2% beneficial ownership of the outstanding institutional shares." ECF No. 54-1 at 10. The statement does not disclose which mutual fund is associated with this "concentration[] of risk." Id.

### G. The Amended Complaint

Terraza filed her initial complaint in this Court on July 14, 2016. ECF No. 1. This Court subsequently related this action to another action pending in this district, Dennis M. Lorenz v. Safeway, Inc., et al., Case No. 16-cv-04903, which asserts similar claims. ECF No. 35.

In her amended complaint, Terraza asserts two claims against the Safeway 401(K) Plan's fiduciaries under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq. See Amended Complaint, ECF No. 37. First, she alleges that, between July 14, 2010 and July 28, 2016, the Safeway Defendants breached their fiduciary duties under ERISA by: (1) allowing for the payment of grossly excessive fees; (2) offering a disproportionate number of non-transparent investment options in the form of common trusts and separately managed

United States District Court
Northern District of California

5

accounts; (3) offering "excessively priced and poorly performing investment options"; (4) failing to offer a diversified investment portfolio that included a complement of passively managed funds; (5) failing to accurately disclose information to Plan participants about fees, including revenue-sharing fees made to service providers like JP Morgan Retirement Plan Services and Great-West; (6) failing to accurately disclose information about the level of risk associated with certain investment options; and (7) allowing the Plan's relationship with JP Morgan Chase Bank, the trustee of the Plan, to inappropriately influence the Plan's investment options.  ECF No. 37.  In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, Terraza asserts a claim for knowing breach of trust.  Id. ¶¶ 82-84.

## II.    JURISDICTION

The Court has subject matter jurisdiction over Plaintiff's claims under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

## III.    REQUEST FOR JUDICIAL NOTICE

The Safeway Defendants request that the Court take judicial notice of several Plan-related documents from the relevant time period, including the 2005 restatement of the Plan with amendments, the summary plan descriptions, Form 5500 filings submitted to the Department of Labor, participant fee disclosure notices, the master services agreement between Safeway and JP Morgan Retirement Plan Services, and two amendments to the master services agreement.  ECF No. 48.  In addition, the Safeway Defendants request that the Court take judicial notice of the definitions of separately managed accounts and collective investment trusts from the Investopedia website, as well as the definition of spread from the Stable Value Investment Association website.  Id.

Pursuant to Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  The Court may also "consider materials incorporated into the complaint," where "the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there

United States District Court
Northern District of California

6

are no disputed issues as to the document's relevance." <u>Coto Settlement v. Eisenberg</u>, 593 F.3d 1031, 1038 (9th Cir. 2010).  This is true even if the plaintiff does not explicitly allege the contents of that document in the complaint.  <u>Knievel v. ESPN</u>, 393 F.3d 1068, 1076 (9th Cir. 2005).  The Court "must take judicial notice if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(c)(2).

The Court takes judicial notice of the Plan-related documents because the Plaintiff's complaint incorporates each of those documents by reference, the complaint necessarily relies on those documents, and neither party questions their authenticity or relevance.  Courts routinely take judicial notice of ERISA plan documents like those at issue here.  <u>See</u>, <u>e.g.</u>, <u>Watkins v. Citigroup Ret. Sys.</u>, No. 15-CV-731 DMS (NLS), 2015 WL 9581838, at *2 (S.D. Cal. Dec. 30, 2015) (taking judicial notice of a pension plan); <u>Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.</u>, 99 F. Supp. 3d 1110, 1126 (C.D. Cal. 2015) (taking judicial notice of Form 5500 filings).

In addition, the Court takes judicial notice of the definitions of various investment terms, which are publicly available on the Investopedia website and the Stable Value Investment Association website.  Plaintiff does not oppose this request or otherwise contend that the documents are inaccurate.  <u>Perkins v. LinkedIn Corp.</u>, 53 F. Supp. 3d 1190, 1204–06 (N.D. Cal. 2014) (taking judicial notice of publicly accessible websites).

## IV.    MOTION TO DISMISS

The Defendants move to dismiss Terraza's complaint for failure to state a claim pursuant to Rule 12(b)(6).[3]  ECF No. 46.  They argue that Terraza's claims are untimely, that she fails to plausibly allege a claim for breach of fiduciary duty, and that the derivative knowing breach of trust claim also fails.  <u>Id</u>.

### A.  Legal Standard for Motion to Dismiss under Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain

---

[3] The Defendants in the related case, <u>Lorenz v. Safeway, Inc. et al.</u>, Case No. 16-cv-04903, filed a motion to dismiss that addresses overlapping factual and legal issues.  Portions of this order are identical to portions of the order in that case.

statement of the claim showing that the pleader is entitled to relief."  While a complaint need not contain detailed factual allegations, facts pleaded by a plaintiff must be "enough to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  While this standard is not a probability requirement, "where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Id. (internal quotation marks omitted).  In determining whether a plaintiff has met this plausibility standard, the Court must accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the plaintiff.  Knievel v. ESPN, 393 F.3d 1068, 1072 (9th Cir. 2005).

### B. Timeliness

ERISA requires that an action be commenced within (1) "six years after . . . the date of the last action which constituted a part of the breach or violation, or . . . in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or (2) "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation," whichever is earlier.  29 U.S.C. § 1113.  The timeliness analysis therefore hinges on when the alleged breach or violation occurred and when the plaintiff had actual knowledge of the breach or violation. Ziegler v. Connecticut Gen. Life Ins. Co., 916 F.2d 548, 550 (9th Cir. 1990).

The Defendants argue that Terraza's claims pertaining to three of the challenged investment options are barred by the six-year statute of repose because the Defendants added those investment options to the Plan before 2010.  ECF No. 46 at 14-15.  They further argue that Terraza's claims relating to the allegedly opaque investment options are barred by the three-year statute of limitations because Plaintiff had actual knowledge that the SEC registration requirements did not apply to those funds by 2012 at the latest.  Id. at 15-16.  Both arguments fail.

First, the alleged breach of fiduciary duty is not limited to the Defendants' initial selection

of the challenged funds. "[A] fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones" that "exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." Tibble v. Edison Int'l, 135 S. Ct. 1823, 1828–29 (2015). As a result, where the plaintiff "allege[s] that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones," the claim is timely "so long as the alleged breach of the continuing duty occurred within six years of suit." Tibble, 135 S. Ct. at 1828-29. Here, Terraza alleges that the Defendants acted imprudently by continuing to offer underperforming investment options with excessive fees until at least 2015, just one year before Terraza filed suit. Therefore, those claims are timely even though three of the investment options were initially added to the Plan before 2010.

Defendants cite the Ninth Circuit's decision in Tibble on remand to support their argument that Terraza's claims are time-barred to the extent they challenge investment options that were initially selected for inclusion in the Plan more than six years before she filed suit. ECF No. 46 at 14-15. But in that case the Ninth Circuit acknowledged that "the Supreme Court reversed our decision concerning the statute of limitations, holding that regardless of when an investment was initially selected, 'a fiduciary's allegedly imprudent retention of an investment' is an event that triggers a new statute of limitations period." Tibble v. Edison Int'l, 843 F.3d 1187, 1192 (9th Cir. 2016) (quoting Tibble, 135 S. Ct. at 1826, 1828-29). The Ninth Circuit went on to explain that, pursuant to the Supreme Court's decision in Tibble, "only a 'breach or violation,' not an original investment decision, need occur to start the six-year statutory period." Id. at 1193. Therefore, the Ninth Circuit's decision in Tibble on remand defeats, rather than helps, the Defendants' argument regarding the six-year statute of repose.

Second, knowledge that the SEC registration requirements did not apply to the allegedly opaque investment options, on its own, does not constitute actual knowledge of the breach of fiduciary duty alleged here. Because a breach of the duty of prudence "hinge[s] on infirmities in the selection process for investment" and a failure to investigate alternatives, "[w]hen beneficiaries claim the fiduciary made an *imprudent* investment, actual knowledge of the breach [will] usually require some knowledge of how the fiduciary selected the investment." Tibble I,

9

729 F.3d at 1121 (internal quotation marks omitted) (emphasis in original).  Defendants do not argue that Terraza has any such knowledge here, and Terraza affirmatively alleges that she did not have such knowledge until shortly before this lawsuit was filed.  ECF No. 37 ¶ 35.

Defendants try to distinguish Tibble I by arguing that actual knowledge of the fiduciaries' decision-making process is not material to Terraza's claim because she "appears to be claiming that under no circumstances is it appropriate for an ERISA fiduciary to offer common trusts and separately managed accounts because they are not bound by SEC registration and prospectus requirements."  ECF No. 46 at 16.  This argument mischaracterizes Terraza's claims.  Her complaint does not challenge the Defendants' decision to include the collective trusts and separately managed accounts solely on the ground that they were not subject to the prospectus and SEC registration requirements.  Rather, it challenges the Defendants' decision to include those options when viewed in light of their expense, their performance, and the investment portfolio as a whole.  ECF No. 37 ¶¶ 4, 39, 42 (alleging that the Defendants "breached their fiduciary duties under ERISA by selecting and retaining opaque, high-cost, and poor-performing investments instead of other available and more prudent alternative investments" and that the Plan offered an overconcentration of these opaque investment options).  These allegations go to the prudence of the Defendants' underlying decision-making process, and Tibble is therefore not distinguishable on this ground.

## C.  Breach of Fiduciary Duty Claim

ERISA Section 404(a)(1) imposes the following duties on plan fiduciaries: the duty of loyalty, the duty of prudence, the duty to diversify the investments, and the duty to act in accordance with the documents and instruments governing the plan.  29 U.S.C. § 1104(a)(1).  Terraza alleges that the Defendants breached the first three of these duties.  ECF No. 37 ¶ 79.

In accordance with the duty of loyalty, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries[ ] and defraying reasonable expenses of administering the plan."  Id. § 1104(a)(1)(A); White v. Chevron Corp., No. 16-CV-0793-PJH, 2016 WL 4502808, at *4 (N.D. Cal. Aug. 29, 2016).  As defined in the Restatement

1   (Third) of Trusts, which is helpful in "determining the contours of an ERISA fiduciary's duty,"

2   Tibble v. Edison Int'l, 135 S. Ct. 1823, 1828 (2015), the duty of loyalty prohibits trustees from

3   "engaging in transactions that involve self-dealing or that otherwise involve or create a conflict

4   between the trustee's fiduciary duties and personal interests."  Restatement (Third) of Trusts § 78

5   (2007).

6          ERISA also requires that a pension plan fiduciary act "with the care, skill, prudence, and

7   diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity

8   and familiar with such matters would use in the conduct of an enterprise of a like character and

9   with like aims." 29 U.S.C. § 1104(a)(1)(B).  Under this "prudent person" standard, courts must

10  determine "whether the individual trustees, at the time they engaged in the challenged

11  transactions, employed the appropriate methods to investigate the merits of the investment and to

12  structure the investment." Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983).  The

13  prudence analysis "focus[es] on a fiduciary's conduct in arriving at an investment decision, not on

14  its results." In re Unisys Sav. Plan Litig., 74 F.3d 420, 434 (3d Cir. 1996).  "Because the content

15  of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts,

16  the appropriate inquiry will necessarily be context specific." Fifth Third Bancorp v.

17  Dudenhoeffer, 134 S. Ct. 2459, 2471 (2014) (quoting 29 U.S.C. § 1104(a)(1)(B)).  This duty of

18  prudence extends to both the initial selection of an investment and the continuous monitoring of

19  investments to remove imprudent ones.  Tibble v. Edison Int'l, 135 S. Ct. 1823, 1828-29 (2015).

20         Plan fiduciaries also have a duty to "diversify[] the investments of the plan so as to

21  minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

22  29 U.S.C. § 1104(a)(1)(C).  "As a general proposition, ERISA's duty to diversify prohibits a

23  fiduciary from investing disproportionately in a particular investment or enterprise." In re Unisys

24  Sav. Plan Litig., 74 F.3d 420, 438 (3d Cir. 1996).  "The degree of investment concentration that

25  would violate this requirement to diversify cannot be stated as a fixed percentage, because a

26  fiduciary must consider the facts and circumstances of each case." Metzler v. Graham, 112 F.3d

27  207, 209 (5th Cir. 1997) (quoting H.R.Rep. No. 1280, 93d Cong., 2d Sess. (1974), reprinted in

28  1974 U.S.Code Cong. & Admin. News 5038, 5084–85 (Conference report at 304).  "To establish a

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1    violation, a plaintiff must demonstrate that the portfolio is not diversified 'on its face.'" Id.

2    (quoting H.R. Rep. No. 93-1280 at 5084)

3         To state a claim for breach of fiduciary duty, a complaint does not need to contain factual

4    allegations that refer directly to the fiduciary's knowledge, methods, or investigations at the

5    relevant times. Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v.

6    Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 718 (2d Cir. 2013). Even in the absence of such

7    direct allegations, the court may be able to reasonably infer from the circumstantial factual

8    allegations that the fiduciary's decision-making process was flawed. Id. (quoting Braden v. Wal-

9    Mart Stores, Inc., 588 F.3d 585, 596 (8th Cir. 2009)). After all, "the circumstances surrounding

10   alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading

11   stage." Concha v. London, 62 F.3d 1493, 1503 (9th Cir. 1995) ("Where a fiduciary exercises

12   discretionary control over a plan, and assumes the responsibilities that this control entails, the

13   victim of his misconduct often will not, at the time he files his complaint, be in a position to

14   describe with particularity the events constituting the alleged misconduct.").

15        The Court now turns to the allegations in Terraza's complaint to determine whether she

16   has plausibly stated a claim for breach of fiduciary duty.

17           **1.**     **Loyalty-Based Allegations**

18        Defendants argue that, although the complaint includes prudence-based allegations, it

19   "alleges no facts suggesting that Defendants violated the distinct duty of loyalty." ECF No. 46 at

20   17. They point to cases where courts in this district have dismissed claims based on a breach of

21   the duty of loyalty where the complaint failed to present separate allegations regarding the duty of

22   loyalty. See Romero v. Nokia, Inc., No. C 12-6260 PJH, 2013 WL 5692324, at *5 (N.D. Cal. Oct.

23   15, 2013); White, 2016 WL 4502808, at *4-5.

24        Unlike the plaintiffs in Romero and White, whose duty of loyalty claims "hinge[d] entirely

25   on the prudence-based allegations," Terraza's complaint includes separate loyalty-based

26   allegations. Romero, 2013 WL 5692324 at *5; see also White, 2016 WL 4502808 at *5 ("[T]he

27   complaint pleads no facts sufficient to raise a plausible inference that defendants took any of the

28   actions alleged for the purpose of benefitting themselves or a third-party entity . . . at the expense

of the Plan participants, or that they acted under any actual or perceived conflict of interest in administering the Plan."). For example, Terraza alleges that "Defendants tasked the trustee [JP Morgan Chase Bank] with confirming the value of its own Common Trusts, an obviously profound conflict-of-interest which is especially dangerous, as these Common Trusts are unregistered and not publicly traded." ECF No. 37 ¶ 69. In addition, she alleges that, according to the 2013-2014 financial statement, "[c]ertain Plan investments are managed or *significantly influenced* by J.P. Morgan Chase Bank N.A., trustee of the Plan." Id. ¶ 51 (emphasis in original). Based on this disclosure, she alleges that this "relationship and influence inappropriately affected and compromised the Plan's investment options." Id. ¶ 52. She further alleges that "JPMCB has a notorious history of engaging in unlawful product-steering practices to influence its customers to invest in its own proprietary funds and, upon information and belief, JPMCB engaged in the same or similar practices with respect to the Plan, and Defendants allowed those practices to occur without addressing or remedying them." Id.

These allegations plausibly suggest that the Safeway Defendants breached their duty of loyalty by allowing the Plan's trustee to make Plan-related decisions that were not in the best interests of Plan participants.

### 2. Duty to Disclose

Consistent with its duty of loyalty, a plan fiduciary must disclose material investment information to Plan participants. Washington v. Bert Bell/Pete Rozelle NFL Ret. Plan, 504 F.3d 818, 823–24 (9th Cir. 2007). "Information is material if there is a substantial likelihood that nondisclosure 'would mislead a reasonable employee in the process of making an adequately informed decision regarding benefits to which she might be entitled.'" Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 599 (8th Cir. 2009) (quoting Krohn v. Huron Mem'l Hosp., 173 F.3d 542, 551 (6th Cir. 1999)); see also Washington, 504 F.3d at 824 (citing Krohn, 173 F.3d at 547). "Materiality is a fact intensive issue which can be decided as a matter of law only if no reasonable trier of fact could disagree." Braden, 588 F.3d at 599.

In 2011, the Department of Labor issued a regulation that outlines the disclosure requirements that ERISA Plan administrators must follow to comply with their fiduciary duties.

United States District Court
Northern District of California

13

See 29 C.F.R. § 2550.404a-5.  Pursuant to that regulation, the Plan administrator "must take steps to ensure . . . that such participants and beneficiaries, on a regular and periodic basis, are made aware of their rights and responsibilities with respect to the investment of assets held in, or contributed to, their accounts and are provided sufficient information regarding the plan, including fees and expenses attendant thereto, to make informed decisions with regard to the management of their individual accounts."  Id. § 2550.404a-5(a).  The information provided in such disclosures must be "complete and accurate."  Id. § 2550.404a-5(b).  Specifically, the Plan administrator must provide to each Plan participant "an explanation of any fees and expenses for general plan administrative services (e.g., legal, accounting, recordkeeping), which may be charged against the individual accounts of participants and beneficiaries . . . "  Id. § 2550.404a-5(c)(2)(i)(A).  The Plan administrator is also required to disclose investment-related information to participants, including performance data, benchmarks, and fee and expense information.  Id. § 2550.404a-5(d).

Terraza alleges that the Defendants breached their fiduciary duties by failing to fully and accurately disclose information to Plan participants about expenses, fees and risks.  ECF No. 37 ¶¶ 44-59.  With respect to expenses, she alleges that "all that Defendants disclosed to participants was the gross expense ratio of any given investment option without detailing the layered fees that existed within these largely unregistered products, the amount of revenue sharing being paid to the Plan's service provider . . . , the purpose of such revenue sharing payments and whether the amount related in any manner to the services being rendered to the Plan and/or the actual entities receiving the revenue sharing payments."  Id.  She also alleges that the Defendants "fail[ed] to disclose that certain portions of those investment fees may be paid to the recordkeeper or the trustee as revenue sharing."  Id.[4]  She claims that "[t]his lack of clarity renders a determination of the true and full nature of the expenses or fees being charged and incurred nearly impossible, and precludes participants from making informed decisions regarding their investments."  Id.

Defendants respond that "all the information required under applicable [Department of

---

[4] She further contends that, "putting aside the undisclosed or indiscernible fees, the disclosed fees are grossly excessive in light of the size and bargaining power of the Plan."  Id. ¶¶ 55, 48, 50.  The Court addresses these allegations, *infra*, in Parts IV.C.4. (excessive fees) and IV.C.5 (revenue-sharing payments).

United States District Court
Northern District of California

United States District Court
Northern District of California

Labor] regulations regarding the fees, expenses and investment performance of the Plan's investment options and revenue sharing arrangements were provided in the annual Participant Disclosure Notices."  ECF No. 46 at 20.  They further argue that "[i]nformation regarding the fees paid to service providers (*i.e.* direct and indirect compensation) is also reported in the Plan's Forms 5500 which are available to the public on the DOL's website."  Id. at 20-21.

With respect to investment fees and revenue sharing payments, the judicially-noticed disclosures that the Defendants provided to Plan participants during the relevant time period comply with the Department of Labor's regulation.  See ECF Nos. 47-10, 47-11, 47-12, 47-13, 47-14.  First, the Participant Disclosure Notices provide that "[e]ach investment has a fee associated with it to cover the cost of managing the investments."  ECF No. 47-13 at 5.  They go on to explain that "[t]he fee is generally taken as a percentage of money invested and is shown as a gross expense ratio," which "is shown as a percentage of assets in the fund and reduces the rate of return of the fund."  Id.  The notices also list the gross expense ratio associated with each individual investment option.  See, e.g., ECF No. 47-13 at 7-9.  The notices explain that "[t]hese fees cover the cost of administering and servicing the plan, which could include recordkeeping, auditing, legal and trustee/custodial expenses."  ECF No. 47-13 at 5.  And the notices explicitly provide that "J.P. Morgan Retirement Plan Services LLC and its affiliates and agents may receive compensation with respect to plan investments, including, but not limited to, sub-transfer agent, recordkeeper, shareholder servicing, 12b-1 or other revenue-sharing fees."  ECF No. 47-10 at 5; see also ECF No. 47-13 at 13 ("GWFS Equities, Inc., or one or more of its affiliates, including Great-West Financial Retirement Plan Services, LLC, may receive a fee from the investment option provider for providing certain recordkeeping, distribution and administrative services.").  The actual fees paid to record-keepers, both direct and indirect, were also disclosed in the Plan's Form 5500s, which are available to the public on the Department of Labor's website.  See ECF Nos. 47-4, 47-5, 47-6, 47-7, 47-8, 47-9.  Therefore, Terraza's allegations that the Defendants failed to adequately disclose investment fees and revenue sharing payments to the record-keeper are rendered implausible by the judicially-noticed disclosures.  See Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003) (explaining that the court is "not required to

15

1    accept as true conclusory allegations which are contradicted by documents referred to in the

2    complaint") (quoting Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295-96 (9th Cir. 1998)).

3          Nor are fiduciaries are required to disclose the "breakdown" of the gross expense ratio

4    associated with each investment option—e.g., the percentage of the total fee that ultimately goes

5    to the trustee as opposed to the record-keeper.  ECF No. 53 at 9, 17, n. 17; ECF No. 37 ¶¶ 44, 48,

6    50.  The Department of Labor regulation simply requires that fiduciaries disclose "[t]he total

7    annual operating expenses of the investment expressed as a percentage (i.e., expense ratio) . . ."

8    29 C.F.R. § 2550.404a-5(d)(1)(iv)(A).[5]  As the Seventh Circuit explained in Hecker, "[t]he total

9    fee, not the internal, post-collection distribution of the fee, is the critical figure for someone

10   interested in the cost of including a certain investment in her portfolio and the net value of that

11   investment."  Hecker v. Deere & Co., 556 F.3d 575, 585-86 (7th Cir. 2009).  Information

12   regarding "[t]he later distribution of the fees . . . is not information the participants needed to know

13   to keep from acting to their detriment," and "thus not material."  Id.  Because "the participants

14   were told about the total fees imposed by the various funds, and the participants were free to direct

15   their dollars to lower-cost funds if that was what they wished to do," the fiduciaries in Hecker had

16   not breached their duty to disclose in this respect.  Id.  The same is true here.

17         Terraza argues that "compliance with 29 C.F.R. § 2550.404a-5 does not automatically

18   mean that a fiduciary satisfies its general duty to disclose."  ECF No. 53 at 17.  However, the

19   regulation explicitly provides that "[c]ompliance with paragraphs (c) and (d) of this section will

20   satisfy the duty to make the regular and periodic disclosures described in paragraph (a) of this

21   section, provided that the information contained in such disclosures is complete and accurate."  29

22   C.F.R. § 2550.404a-5(b).  In turn, paragraph (a) references this duty to disclose in the context of

23   the broader fiduciary duties of loyalty and prudence.  Id. § 2550.404a-5(a).  Moreover, the

_____

24

25   [5] Terraza cites to a provision that tells fiduciaries how to "calculate[]" the "total annual operating
     expenses," but that provision does not alter what must otherwise be disclosed to plan participants

26   under § 2550.404a-5(d)(1)(iv)(A).  See 29 C.F.R. § 2550.404a-5(h)(5); ECF No. 53 at 18, n. 17.
     The Department of Labor's final rule adopting the regulation confirms that "such a breakdown is

27   not necessary, or particularly useful, to participants and beneficiaries; the final rule therefore also
     allows for 'aggregate' disclosure of administrative expenses, as proposed."  Fiduciary

28   Requirements for Disclosure in Participant-Directed Individual Account Plans, 75 FR 64910-01,
     n. 8.

United States District Court
Northern District of California

1   Department of Labor's final rule adopting the regulation states that the regulation "establishes

2   uniform, basic disclosures for such participants and beneficiaries."  Fiduciary Requirements for

3   Disclosure in Participant-Directed Individual Account Plans, 75 FR 64910-01 at 64910.

4   Therefore, the text of the regulation itself, as well as the Department of Labor's guidance

5   regarding the regulation, suggest that a fiduciary satisfies its duties of prudence and loyalty if it

6   complies with the regulation's disclosure requirements.[6]

7        In sum, the Defendants' disclosures with respect to fees, expenses, and revenue sharing

8   payments comply with the Department of Labor's regulation on their face and are "complete and

9   accurate," and Terraza fails to allege any extraordinary circumstances that would require

10  additional disclosures.  Therefore, she has failed to plausibly allege that the Defendants breached

11  their fiduciary duties with respect to these disclosures.

12       Terraza does, however, plausibly allege that the Defendants failed to disclose other

13  material information to Plan participants.  For example, she alleges that the fiduciaries'

14  characterization of the JP Morgan target date funds as "passive" is misleading because those funds

15  "combine both actively managed and indexed strategies."  ECF No. 37 ¶ 53.  She further alleges

16  that "[t]here was no meaningful information supplied to Plan participants regarding Safeway's

17  common stock fund . . . such as whether an investment manager was appointed [and] the use or

18  availability of short-term holdings."  Id. ¶ 59.  With respect to risk, she alleges that the 2013-2014

19  financial statement disclosed a "concentration of risk" without identifying the mutual fund

20  associated with that risk.  Id. ¶ 58.  As a result, she alleges, "it is impossible to determine if

21  inclusion of that mutual fund unbalances the risk allocation of the Plan's investment options as a

22  whole, and participants were not fully informed of that investment option's risk . . ."  Id.  Finally,

23  she alleges that the fiduciaries failed to disclose "the exact nature, extent, and identity of

24

25  [6] Terraza points to a footnote in a Department of Labor's final rule adopting the regulation, which
    provides that "there may be extraordinary situations when fiduciaries will have a disclosure
26  obligation beyond those addressed by the final rule."  Fiduciary Requirements for Disclosure in
    Participant-Directed Individual Account Plans, 75 FR 64910-01, n. 17.  The footnote cites fraud as
27  an example of the kind of extraordinary situation that would impose additional disclosure
    obligations.  Id.  But Terraza does not allege any such "extraordinary" circumstances here that
28  would impose additional disclosure obligations above and beyond those imposed by the
    regulation.

United States District Court
Northern District of California

investment options 'significantly influenced' by JPMCB." Id. ¶ 52.  These detailed factual allegations plausibly suggest that the fiduciaries failed to disclose "complete and accurate" information regarding certain investment options and conflicts, thus breaching their duty of loyalty to Plan participants.  See Braden, 588 F.3d at 600 ("ERISA's duty of loyalty may require a fiduciary to disclose latent conflicts of interest which affect participants' ability to make informed decisions about their benefits.").  And the Court cannot conclude as a matter of law that this information would not be material to a reasonable employee when making an informed investment decision.  Washington, 504 F.3d at 824; Braden, 588 F.3d at 599.

Terraza has plausibly alleged that the Defendants breached their duty of loyalty by failing to disclose material information to Plan participants.

### 3.    Overconcentration of Opaque Investment Options

Plaintiff alleges that the Defendants breached their fiduciary duties by offering a disproportionate number of non-transparent investment options in the form of common trusts and separately managed accounts.  ECF No. 37 ¶¶ 36-39.  She alleges that "nine of the 15 riskier investment options were opaque Common Trust vehicles, with two of the remaining six options non-transparent SMAs." Id. ¶ 30.  She further alleges that, "as of December 31, 2014, over *a third* of the Plan's $1.9 billion in assets were placed in the opaque Common Trusts and over *48%* were placed in Common Trusts or SMAs." Id. ¶ 42.  She notes in her complaint that these investment options "are not required to file a prospectus or registration statement with the SEC." Id. at 13, n. 2, 3.

Defendants argue that the inclusion of common trusts and separately managed accounts does not constitute "a *per se* ERISA violation" and that Terraza has failed to allege facts that would otherwise suggest imprudence in this regard.  ECF No. 46 at 19.  They further argue that "the claims in the FAC boil down to nothing more than an argument that because SMAs and common trusts are not subject to prospectus and SEC registration requirements, they are inferior to mutual funds and therefore imprudent." Id.

The Court agrees with the Defendants.  Although these investment vehicles are not subject to certain SEC requirements, courts have recognized that common trusts and SMAs offer

United States District Court
Northern District of California

"numerous benefits to Plan participants over retail mutual funds."  White v. Chevron Corp., No. 16-CV-0793-PJH, 2016 WL 4502808, at *9 (N.D. Cal. Aug. 29, 2016).  And Terraza fails to cite a single case holding that fiduciaries breach their duty of prudence by offering a disproportionate number of these investment vehicles in their plans.  In fact, one court recently rejected a similar theory, finding that "[t]he concentration of mutual funds in the [plan], without more, does not support a finding that [the defendants] breached their fiduciary duties under ERISA."  Rosen v. Prudential Ret. Ins. & Annuity Co., No. 3:15-CV-1839 (VAB), 2016 WL 7494320, at *15 (D. Conn. Dec. 30, 2016) (rejecting plaintiffs' argument that the defendants breached their fiduciary duties by offering sixteen investment options, fourteen of which were mutual funds).  Although Terraza alleges that the Defendants here acted imprudently by offering an overconcentration of common trusts and SMAs at the expense of mutual funds, her theory fails for the same reasons.

Terraza's allegations regarding the overconcentration of opaque investment options offered by the Plan fail to support her claim for breach of fiduciary duty.

### 4. Excessive Fees

Next, Terraza alleges that the Defendants breached their fiduciary duties by offering "excessively priced and poorly performing investment options."  ECF No. 37 ¶ 40.  She alleges that "Defendants offered investments in the Plan that had grossly excessive fees by any objective standard (and paid correspondingly excessive fees to the Plan's service provider . . . for recordkeeping and related services)."  Id. ¶ 17.  She further alleges that "[t]hese fees are, on their face, unreasonable in many instances and often are multiple times higher than the amounts they should be (when compared to the expense ratios that would be associated with typical mutual fund share classes held in retirement plan assets of the same or similar size of the Safeway Plan), based upon the market and negotiating power of the Plan at the time that these investment options were offered."  Id. ¶ 60.  Specifically, Terraza challenges the decision to include the following investment options based on their excessive fees: the SSgA S&P 500 Index NL-A Common Trust (gross expense ratio of .16 percent); the Interest Income Fund (gross expense ratio of .25%); the JP Morgan target date funds (gross expense ratio between .47 percent and .50 percent); the PIMCO Bond Fund SMA (gross expense ratio of .46 percent); the Dodge & Cox Stock Mutual

Fund (gross expense ratio of .52 percent); Wells Fargo Advantage Large Cap Growth-Inst Mutual Fund (gross expense ratio of .79 percent); and RS Small Cap Value Portfolio SMA (gross expense ratio of .89 percent).  Id. ¶¶ 60-68.  Terraza alleges that these investment options all charged higher expense ratios than, and underperformed relative to, comparable options offered by Vanguard during the relevant period.  Id.  She further alleges that the total plan cost was two to three times more expensive than the average for plans of a similar size.  Id. ¶ 31.

The Defendants' failure to offer the investment option with the lowest expense ratio is not enough, on its own, to plausibly state a claim for breach of the duty of prudence.  As the Seventh Circuit has repeatedly explained, "[t]he fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."  Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009); Loomis v. Exelon Corp., 658 F.3d 667, 670 (7th Cir. 2011) (quoting Hecker, 556 F.3d at 586).  The Ninth Circuit has agreed with this approach, noting that "[t]here are simply too many relevant considerations for a fiduciary, for that type of bright-line approach to prudence to be tenable."  Tibble v. Edison Int'l, 729 F.3d 1110, 1135 (9th Cir. 2013), vacated on other grounds, 135 S. Ct. 1823 (2015).  Courts in this district have similarly cautioned that "[i]t is inappropriate to compare distinct investment vehicles solely by cost, since their essential features differ so significantly."  See, e.g., White v. Chevron Corp., No. 16-CV-0793-PJH, 2016 WL 4502808, at *12 (N.D. Cal. Aug. 29, 2016).  Therefore, the Court cannot reasonably infer from the fee differential on its own that the Defendants acted imprudently in selecting the challenged funds.

However, Terraza alleges more than that, and the remaining allegations in the complaint create a plausible inference that the Defendants' decision-making process was flawed.  See Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 601, n.7 (8th Cir. 2009) (noting that, although "a bare allegation that cheaper alternative investments exist in the marketplace" is not sufficient on its own to state a claim for a breach of fiduciary duty under ERISA, a court ruling on a motion to dismiss must rest its conclusions "on the totality of the specific allegations in [the] case").  For example, she alleges that, "during the pertinent period, almost all of the investment options  . . .

underperformed compared to their benchmark." Id. ¶ 60.  While it is true that "we judge a
fiduciary's actions based upon information available to the fiduciary at the time of each
investment decision and not from the vantage point of hindsight," St. Vincent, 712 F.3d at 716
(internal citations and quotation marks omitted), a fiduciary also "has a continuing duty of some
kind to monitor investments and remove imprudent ones" that "exists separate and apart from the
trustee's duty to exercise prudence in selecting investments at the outset." Tibble, 135 S. Ct. at
1828-29.  And Terraza alleges that "[a]ll of this information [regarding the challenged funds'
underperformance] was known and/or available to Defendants each and every year during the
pertinent period when they maintained this costly and unreasonable investment option in the
Plan." Id. ¶¶ 61-68.  Terraza also alleges a potential reason why the Defendants might have
selected and retained at least some of these relatively expensive and underperforming investment
options:  at the time the Plan selected the JP Morgan target date funds, JP Morgan Chase Bank
was trustee of the Plan, JP Morgan Retirement Plan Services was record-keeper for the Plan, and
the 2013-2014 financial disclosures state that "[c]ertain plain investments are managed or
***significantly influenced*** by J.P. Morgan Chase Bank N.A." Id. ¶ 51 (emphasis in original).
Terraza further alleges that this "relationship and influence inappropriately affected and
compromised the Plan's investment options." Id. ¶ 52.  When viewed collectively, the Court can
reasonably infer from these allegations that the Defendants engaged in a flawed decision-making
process by selecting and retaining the challenged investment options.  See Braden, 588 F.3d at
596-98 (holding that the plaintiff stated a claim for breach of fiduciary duty where he alleged that
the Plan offered funds that charged higher fees than available alternatives, that underperformed
during the relevant time period, and that were included in the Plan because of improper influence
by the Plan's trustee).

The Court also notes that, at least with respect to one of the investment options offered by
the Plan, the *only* difference between the option that was offered and the option that allegedly
should have been offered was price.  With respect to the JP Morgan target date funds, Terraza
alleges that "Defendants did not even secure the least expensive share class available, despite the
Safeway Plan's size (making the least expensive share class easily available)."  ECF No. 37 ¶ 63.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    She points out that "[t]he Plan offered the C20 share class, which, as of March 31, 2016, had an

2    expense ratio of either 45 or 46 basis points (.45% or .46%)," even though the Plan qualified for

3    both the CF share class (which charged 25 or 26 basis points) and the CF10 share class (which

4    charged 35 or 36 basis points) based on its size. <u>Id</u>. Defendants concede in their briefing that the

5    plaintiff in <u>Braden</u> made a similar allegation and that, in those circumstances, "there was no

6    distinction whatsoever, *other than price*, between the funds actually offered and the funds that

7    [the] plaintiff in *Braden* alleged should have been offered." ECF No. 56 at 11. The same is true

8    here: Terraza alleges that the Defendants could have offered the exact same investment option for

9    a lower price based on the Plan's size. The Court can reasonably infer from this allegation that the

10   Defendants acted imprudently by selecting the more expensive option, all else being equal.

11          Although the Defendants may ultimately persuade the Court that they had legitimate

12   reasons to select the challenged investment options, and thus did not act imprudently, Terraza has

13   satisfied her burden at this stage of the litigation by alleging facts from which the Court can

14   reasonably infer that the Defendants' decision-making process was flawed. <u>See</u> <u>Braden</u>, 588 F.3d

15   at 596 (holding that, although the defendants "could have chosen funds with higher fees for

16   various reasons," "Rule 8 does not require a plaintiff to plead facts tending to rebut all possible

17   lawful explanations for a defendant's conduct").

18          Defendants argue that the challenged expense ratios are nonetheless within a range that

19   other courts have found to be "reasonable as a matter of law." ECF No. 46 at 23. This argument

20   suffers from several infirmities.

21          First, this approach would effectively carve out a presumption of prudence for expense

22   ratios that fell within a certain range. But the Supreme Court has rejected presumptions of

23   prudence in the ERISA pleading context, advocating instead for "careful, context-sensitive

24   scrutiny of a complaint's allegations" as a means to "divide the plausible sheep from the meritless

25   goats." <u>Fifth Third Bancorp v. Dudenhoeffer</u>, 134 S. Ct. 2459, 2470 (2014). The Ninth Circuit

26   has similarly rejected a "bright-line approach to prudence" that hinges exclusively on cost, noting

27   that "[t]here are simply too many relevant considerations for a fiduciary" for that approach to be

28   tenable. <u>See</u> <u>Tibble I</u>, 729 F.3d at 1135. Even the Defendants argue elsewhere in their briefing

22

that cost should not be dispositive of the prudence inquiry. ECF No. 46 at 23 ("*[P]rice is not the only factor*.") (emphasis in original). But they cannot have their cake and eat it, too. Just as the plaintiff cannot plausibly allege a breach of fiduciary duty by simply pointing to the cost of the challenged investment in isolation, the defendants cannot defeat a claim for breach of fiduciary duty by doing the same thing. In other words, the prudence inquiry is "fact intensive." Tussey, 746 F.3d at 336. And, because it involves the application of a reasonableness standard, "[r]arely will such a determination be appropriate on a motion for summary judgment," let alone a motion to dismiss. Bd. of Trustees of S. California IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp., No. 09 CIV. 6273 RMB, 2011 WL 6130831, at *3 (S.D.N.Y. Dec. 9, 2011). The Court therefore refuses to adopt an approach that would immunize an investment from scrutiny simply because its expense ratio fell within a certain range.

The Ninth Circuit's decision in Tibble I is consistent with this fact intensive approach to the prudence inquiry. There, the Ninth Circuit affirmed the district court's *summary judgment* order, not a dismissal under Rule 12(b)(6). Tibble v. Edison Int'l ("Tibble I"), 729 F.3d 1110, 1135 (9th Cir. 2013), vacated on other grounds, 135 S. Ct. 1823 (2015). In deciding to grant the defendant's motion for summary judgment, the district court below had relied on a wealth of evidence to assess whether the inclusion of the challenged fund was prudent, including expert testimony regarding whether the alternative investment option was an appropriate comparator. See Tibble v. Edison Int'l, 639 F. Supp. 2d 1074, 1115 (C.D. Cal. 2009), aff'd, 711 F.3d 1061 (9th Cir. 2013), and aff'd, 729 F.3d 1110 (9th Cir. 2013), and aff'd, 820 F.3d 1041 (9th Cir. 2016), vacated and remanded on other grounds, 843 F.3d 1187 (9th Cir. 2016). The district court ultimately concluded that "Plaintiffs [had] not identified any evidence" to suggest that "the retail mutual funds that were actually chosen for inclusion in the Plan underperformed as compared to other retail mutual funds that were available on the market." Id. at 1116. On appeal, the Ninth Circuit referenced the lower court's post-trial findings of fact, and then went on to note, "[n]or is the particular expense ratio range [of .03 to two percent] out of the ordinary enough to make the funds imprudent." Tibble I, 729 F.3d 1110, 1135. This sentence, when viewed in its context and in light of the procedural posture of the case, does not suggest that an investment is necessarily

prudent as a matter of law just because its expense ratio falls within a particular range.  Rather, the Ninth Circuit was simply noting, after relying primarily on the district court's extensive post-trial findings of fact, that the challenged expense ratios were not so excessive on their face that they could create a triable issue regarding breach of fiduciary duty absent any other evidence that would otherwise suggest imprudence.

Unlike the district court in Tibble I, this Court is not being asked to decide whether the evidence sufficiently backs up Terraza's claims at this early stage in the litigation.  Rather, it must accept those allegations as true and construe any inferences reasonably flowing from those allegations in the light most favorable to her.  As explained above, Terraza's complaint, when read as a whole, plausibly alleges that the Defendants acted imprudently by offering the challenged investment options.  Tibble I is therefore distinguishable.

The out-of-circuit cases that the Defendants rely on are also distinguishable because they involved challenges to the overall range of investment options offered in the portfolio as a whole, rather than a challenge to the fiduciary's decision to include a particular investment option.  For example, the plaintiffs in Renfro challenged the "plan's mix and range of investment options," not "the prudence of the inclusion of any particular investment option."  Renfro v. Unisys Corp., 671 F.3d 314, 325–28 (3d Cir. 2011) (dismissing the plaintiffs' claim because the plan offered "a reasonable range of investment options with a variety of risk profiles and fee rates," including an expense ratio range between .1 percent to 1.21 percent).  Given the nature of the plaintiffs' claim, the Renfro court framed its holding in the following way:  "[T]he range of investment options and the characteristics of those included options—including the risk profiles, investment strategies, and associated fees—are highly relevant and readily ascertainable facts against which the plausibility of *claims challenging the overall composition of a plan's mix and range of investment options* should be measured."  Id. at 327 (emphasis added).  The plaintiffs in Hecker similarly challenged "the fee distribution," alleging that the fiduciaries "offered *only* investment options with excessively high fees."  Hecker v. Deere & Co., 556 F.3d 575, 584–85 (7th Cir. 2009) (emphasis added) (dismissing plaintiffs' claim because "the undisputed facts leave no room for doubt that the Deere Plans offered a sufficient mix of investments for their participants," including

24

a "wide range of expense ratios" between .07 percent and just over one percent).  Later, in

Loomis, the Seventh Circuit characterized its holding in Hecker in the following way: "We held

that as a matter of law that was an acceptable array of investment options."  Loomis v. Exelon

Corp., 658 F.3d 667, 670 (7th Cir. 2011).  In other words, those courts held that the *range* of

expense ratios offered was reasonable, not that a fiduciary's decision to include an investment

option that has an expense ratio within that range is always reasonable as a matter of law.

In contrast, Terraza's allegations regarding excessive fees challenges the inclusion of

specific investment options.  As a result, the overall expense ratio range is less relevant in this

case.  "Under ERISA, the prudence of investments or classes of investments offered by a plan

must be judged individually."  Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 325 (5th Cir.

2007) (citing In re Unisys Sav. Plan Litig., 74 F.3d 420, 438–41 (3d Cir. 1996)).  In other words,

"a fiduciary must initially determine, and continue to monitor, the prudence of *each* investment

option available to plan participants."  DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 423 (4th Cir.

2007) (emphasis in original).  While it is true that, consistent with "modern portfolio theory,"

fiduciaries must also give appropriate consideration to "the role [an] investment or investment

course of action plays in that portion of the plan's investment portfolio," courts have cautioned

that, "[s]tanding alone, [modern portfolio theory] cannot provide a defense to the claimed breach

of the 'prudent [person]' duties . . . "  Id. (quoting 29 C.F.R. § 2550.404a-1).  Therefore, the

Defendants cannot point to the prudence of the portfolio as a whole to evade their duty of

prudence with respect to the challenged investment options.

Moreover, to the extent Hecker and its progeny are relevant, they are nonetheless

distinguishable on another ground:  Safeway's Plan offered a much narrower range of investment

options and higher minimum expense ratios.  According to the annual participant fee disclosure

notices, the Plan offered a total of eighteen to twenty-two investment options during the relevant

time period, with expense ratios that ranged from .15 percent to 1.42 percent.  ECF Nos.  47-10,

47-11, 47-12, 47-13, 47-14.  This limited menu of options pales in comparison to the over 2,500

mutual funds offered by the plan in Hecker and the seventy-three options offered by the plan in

Renfro.  Hecker, 556 F.3d at 578; Renfro, 671 F.3d at 318.  With respect to the number of

25

investment options offered, this case is more analogous to <u>Braden</u>, where the plan offered just thirteen investment options. <u>Braden</u>, 588 F.3d at 589. There, the court concluded that "[t]he far narrower range of investment options available in this case makes more plausible the claim that this Plan was imprudently managed." <u>Id</u>. at 596, n. 6. The lowest expense ratio offered during the relevant time period, .15 percent, is also higher than the lowest expense ratios offered by the plans at issue in the <u>Hecker</u> line of cases. <u>Hecker</u>, 556 F.3d at 581 (minimum expense ratio of .07 percent); <u>Loomis</u>, 658 F.3d at 669 (minimum expense ratio of .03 percent); <u>Renfro</u>, 671 F.3d at 319 (minimum expense ratio of .1 percent).

The <u>Hecker</u> line of cases is distinguishable for yet another reason. <u>See Tussey</u>, 746 F.3d at 336 (noting that the courts in <u>Hecker</u>, <u>Loomis</u>, and <u>Renfro</u> "carefully limited their decisions to the facts presented"). The Eighth Circuit has distinguished <u>Hecker</u> and its progeny where the complaint includes "allegations of wrongdoing with respect to fees." <u>Id</u>. ("The facts of this case, unlike the cited cases, involve significant allegations of wrongdoing, including allegations that [the fiduciaries] used revenue sharing to benefit [the fiduciaries] and [the record-keeper] at the Plan's expense."). Like the plaintiffs in <u>Braden</u> and <u>Tussey</u>, Terraza alleges that the fiduciaries engaged in wrongdoing by unreasonably compensating the Plan's record-keeper through revenue sharing payments. ECF No. 37 ¶¶ 4, 44–48, 55. She also alleges that the fiduciaries erred by allowing the Plan's trustee to improperly "influence[]" the investment options offered by the Plan. <u>Id</u>. ¶ 51. These allegations further support Terraza's claim that the fiduciaries breached their duties to the Plan.

Finally, lacking support from the federal circuit courts, the Defendants point to a decision from a court in this district, <u>White v. Chevron Corp.</u>, No. 16-CV-0793-PJH, 2016 WL 4502808, at *1 (N.D. Cal. Aug. 29, 2016). The analogy to that case fails for the same reasons. As an initial matter, it is unclear whether that case dealt with a challenge to the overall investment lineup, the inclusion of particular funds, or some combination of the two. <u>Id</u>. at *8, *12 ("This cause of action challenges the defendants' decisions with regard to the selection and maintenance of the Plan's mix and range of investment options. . . . [w]hile plaintiffs appear to be challenging the entire lineup of funds, the challenge is primarily based on speculation that the Plan fiduciaries

United States District Court
Northern District of California

1  "could have" provided lower-cost versions of the funds, . . .").  In any event, the <u>White</u> court relied

2  on <u>Hecker</u> and its progeny for the proposition that "[t]he breadth of investments and range of fees

3  the Plan offered participants fits well within the spectrum that other courts have held to be

4  reasonable as a matter of law."  <u>Id</u>. at * 11.[7]  The court concluded that "the Plan fiduciaries

5  provided a diverse mix of investment options and expense ratios for participants."  <u>Id</u>.  As

6  explained above, the breadth and range of investment options is less relevant here because, unlike

7  the plaintiff in <u>White</u>, Terraza does not challenge the overall range of fees offered.  Moreover, to

8  the extent the overall range is relevant to Terraza's claim regarding the inclusion of the challenged

9  funds, the plan at issue in <u>White</u> offered thirty-one investment options, almost one-third more than

10  the maximum number of options offered by Safeway's Plan, and the lowest expense ratio offered

11  by the plan in <u>White</u> was just .05 percent, compared to the .15 percent minimum expense ratio

12  offered here.  <u>Id</u>. at *2, *11.  <u>White</u> is also distinguishable because there were no allegations of

13  wrongdoing.  <u>Id</u>.  For all of these reasons, the <u>White</u> court concluded that the claims at issue there

14  were "more akin to the claims that failed in <u>Loomis</u>, <u>Renfro</u>, and <u>Hecker</u>."  <u>Id</u>. at *12.

15      In sum, this case is more analogous to the <u>Braden</u> line of cases than the <u>Hecker</u> line.  The

16  Defendants argue that, when viewed in isolation, each of Terraza's allegations do not plausibly

17  suggest a flawed decision-making process.  However, "the complaint should be read as a whole,

18  not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  <u>Braden</u>,

19  588 F.3d at 594 (citing <u>Vila v. Inter–Am. Inv. Corp.</u>, 570 F.3d 274, 285 (D.C. Cir. 2009)).  When

20  read in this way, and when construed in the light most favorable to her, Terraza's allegations

21  plausibly suggest that the Defendants acted imprudently in selecting and retaining the challenged

22  investment options.

23          **5.    Revenue Sharing Payments**

24      Terraza alleges throughout her complaint that the Defendants breached their fiduciary

25  duties by allowing the Plan to pay "grossly excessive" and "unreasonable" revenue sharing

26

27  _____

28  [7] Notably, the <u>White</u> court granted the plaintiff leave to amend the complaint, suggesting that the
challenged expense ratios were not actually *per se* reasonable as a matter of law.  <u>Id</u>. at *19.  If
they were, any amendment would have been futile.

1    payments to the trustee and record-keeper.  ECF No. 37 ¶¶ 4, 44–48, 55.

2        Revenue sharing arrangements are not *per se* prohibited under ERISA.  See White, 2016

3    WL 4502808 at *14 (rejecting "plaintiffs' conclusory assertion that fees under a revenue-sharing

4    arrangement are necessarily excessive and unreasonable" as "without support"); Rosen v.

5    Prudential Ret. Ins. & Annuity Co., No. 3:15-CV-1839 (VAB), 2016 WL 7494320, at *10 (D.

6    Conn. Dec. 30, 2016) ("Plaintiffs' allegations that Prudential engaged in revenue sharing, without

7    more, do not state a claim for a violation of ERISA.").[8]  However, the Employee Benefits Security

8    Administration of the United States Department of Labor has opined that, to comply with their

9    fiduciary duties under ERISA, "the responsible plan fiduciaries must assure that the compensation

10   the plan pays directly or indirectly to [the service provider] for services is reasonable, taking into

11   account the services provided to the plan as well as all fees or compensation received by [the

12   service provider] in connection with the investment of plan assets, including any revenue sharing."

13   Employee Benefits Security Administration of the U.S. Department of Labor, Advisory Opinion

14   2013-03A (July 3, 2013).

15       Terraza alleges that, because the 2013-2014 financial statement provides that

16   "[p]articipants are charged $3.00 quarterly to cover the administrative costs of the [P]lan," any

17   additional fees paid to the trustee or record-keeper via revenue sharing payments above and

18   beyond this amount are "by definition, excessive and unreasonable."  ECF No. 37 ¶ 46; ECF No.

19   53 at 20.[9]  Courts have denied motions to dismiss claims for breach of fiduciary duty where the

20   plaintiff made similar allegations.  See, e.g., Santomenno v. Transamerica Life Ins. Co., No. CV

21   12-02782 DDP MANX, 2013 WL 603901, at *3, *10 (C.D. Cal. Feb. 19, 2013) (holding that

22   plaintiffs had stated a claim for breach of fiduciary duty where they alleged that the revenue

23   sharing payments to the third-party service provider were excessive because "the underlying

24   mutual funds' investment management fees covered all of the necessary investment

25   _____

26   [8] In fact, courts have noted that revenue sharing is a "common and acceptable investment industry practice[] that frequently inure[s] to the benefit of ERISA plans."  Tussey, 746 F.3d at 336 (internal quotation marks omitted).

27   [9] The "Administrative fees" section of the Participant Fee Disclosures similarly provides that the $3 quarterly fee "cover[s] the administrative costs of the plan," including "recordkeeping, auditing, legal and trustee/custodial expenses."  ECF No. 47-14 at 5.

28

United States District Court
Northern District of California

management/advisory services needed for the mutual fund") (internal quotation marks omitted).

The Defendants dispute the factual premise upon which Terraza's allegations regarding excessive revenue sharing payments is based, arguing that, "although revenue sharing payments were made from the investment options to the Plan's recordkeeper, the amount of compensation JPM received in exchange for the services it provided was capped at a flat per participant fee of $67," which was lowered to $65 in 2011.  ECF No. 46 at 21.  As a result, they argue, Terraza has failed to allege facts that plausibly suggest misconduct.  Id. at 21-22.

Although the Court construes all allegations in the complaint as true when ruling on a motion to dismiss, it is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."  Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003) (quoting Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295-96 (9th Cir. 1998)).  Therefore, the Court also considers the extent, if any, to which the judicially-noticed documents contradict Terraza's allegations or otherwise render them implausible.

Some aspects of the master services agreement support the Defendants' compensation theory.  In that document, Safeway agreed to compensate JP Morgan Retirement Planning Services, and later Great-West, for their record-keeping services through an annual "Contingent Per Participant Fee."  ECF No.47-17 at 22.  Under this arrangement, the record-keeper would initially be "compensated from . . . the service fees or other compensation paid to [the record-keeper] with respect to the Plan's investment options."  Id. That is, the record-keeper would receive a percentage of the fees charged for each investment as a credit toward record-keeping services.  Id. at 30.  This is what Terraza refers to as the revenue-sharing payments.  However, the agreement goes on to provide that these payments were simply used to offset the annual per-participant fee: If the service fees that the record-keeper received for a particular quarter fell below one-quarter of the annual per-participant fee, Safeway was required to "make a lump sum payment to [the record-keeper] … in an amount equal to the difference between the foregoing amount and the amount of the actual annual service fees received by [the record-keeper]."  Id. at 22.  Conversely, "[i]n the event the annual service fees received by [the record-keeper] exceed $65.00

United States District Court
Northern District of California

29

per Participant at the end of the Plan Year, [the record-keeper] shall accumulate accruals under the Plan Expense Arrangement ("PEA") in accordance with the terms and conditions of the PEA Addendum to the Agreement." Id. at 22, 42 ("Accruals will be calculated and attributed to the PEA at the end of each calendar quarter for all service fees received by [the record-keeper] related to . . . investments in the Plan in excess of the applicable Contingent Per Participant Fee . . ."). The excess funds in the PEA account could only be used at the direction of the Defendants to reasonably compensate third-party service providers, in accordance with ERISA. Id. at 38-40. Notably, the Defendants expressly chose the "Contingent Per Participant Fee" option in lieu of a "No Recordkeeping Fee" option, under which the record-keeper would have been compensated "solely from . . . the service fees or other compensation paid or credited to [the record-keeper] with respect to the Plan's investment options"—that is, a true revenue sharing compensation arrangement. Id. at 22-23. These provisions suggest that the record-keepers' compensation was capped at the $65 or $67 annual per participant fee, and therefore that Terraza must allege that this fee, and not the asset-based fees associated with particular investment options, was itself unreasonable or excessive to state a claim for breach of fiduciary duty on this ground.

However, Terraza points out that there is at least one provision in the master services agreement that plausibly supports her compensation theory—i.e., that the record-keeper received some compensation in excess of the per-participant fee. ECF No. 53 at 19.[10] The PEA addendum provides that any accruals in the PEA account "expire at 3:00 p.m. Central Time on the last business day, as determined by JPMorgan RPS, of each subsequent Plan Year, or upon the termination of the Agreement or this Addendum." ECF No. 47-17 at 38. The addendum does not explain what happens to the expired funds. See id. But, because the record-keeper (i.e., JP

---

[10] In their reply, Defendants argue that the Court may not consider this argument because it "improperly centers on contentions that do not even appear in the [First Amended Complaint] itself" and the purpose of a motion to dismiss is to test the sufficiency of the complaint. ECF No. 56 at 16. This argument fails. The Court may consider judicially-noticed materials incorporated into the complaint on a motion to dismiss without converting it into a motion for summary judgment. United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (citing Moore's Federal Practice § 12.34 (3d ed. 1999)). Indeed, the Defendants invited the Court to do so in this case by requesting that the Court take judicial notice of the master services agreement and then arguing that the Plaintiff's allegations were implausible in light of that document. ECF No. 48.

United States District Court
Northern District of California

Morgan Retirement Plan Services) maintains the PEA account, it is plausible that any expired funds go to the record-keeper.  See id.  Such an arrangement would also explain why the Defendants and the record-keeper entered into an amendment on November 1, 2013 to create an "ERISA spending account" to replace the PEA.  ECF No. 47-19 at 2.  Pursuant to that amendment, if revenue-sharing fees exceed the annual per-participant fee at the end of the year they will be attributed to the ERISA spending account.  Id.  The ERISA spending account addendum materially differs from its PEA predecessor because (1) the accruals do not expire and (2) it provides that "[i]n the event Plan Sponsor does not exhaust the Account for a given calendar quarter, Plan Sponsor may allocate such eligible unused amounts, held in the Account to Participant accounts."  Id. at 5.  Terraza persuasively argues that such an amendment would have been unnecessary if there were never any unused accruals in the PEA in the years prior.

The Court therefore concludes that the judicially noticed documents do not refute Terraza's allegations regarding revenue-sharing payments or otherwise render them implausible. They do, however, create a factual dispute that cannot be resolved on a motion to dismiss.  Terraza has plausibly alleged that the Defendants allowed the Plan to compensate the record-keeper through revenue-sharing payments that exceeded the underlying administrative fees that were supposed to cover all necessary services, thus resulting in unreasonable compensation and a breach of fiduciary duty.  See Santomenno, 2013 WL 603901, at *3, *10.  Although the Defendants may ultimately defeat Terraza's theory of unreasonable compensation by showing that they were not actually compensated in excess of the per-participant fee, or that their compensation was otherwise reasonable, the Court cannot resolve this factual issue at this stage of the litigation.  This is especially true because Terraza has not yet had the benefit of discovery, and therefore lacks inside information regarding the Defendants' decision-making process and the compensation actually provided to the record-keepers.

### 6.     Duty to Diversify Investments

Although the complaint is otherwise very detailed, only a couple of allegations relate to the distinct duty to diversify.  Plaintiff alleges that the Plan's investment options "were exceptionally limited in number and virtually lacking in the necessary complement of passively managed mutual

1    funds or other investments to make the Plan's investment portfolio appropriately diversified based

2    upon any reasoned fiduciary review."  ECF No. 37 ¶ 40-41.  She further alleges that passively-

3    managed funds generally provide better returns than actively-managed funds.  Id.

4         These conclusory allegations fail to state a claim for breach of the duty to diversify

5    investments.  See St. Vincent, 712 F.3d at 724 (affirming Rule 12(b)(6) dismissal of claims based

6    on duty to diversify because plaintiff "[did] not support its diversification claim with factual

7    allegations sufficient to elevate it from the realm of mere 'legal conclusions'") (quoting Iqbal, 556

8    U.S. at 679)).  And courts have rejected the notion that offering a majority of actively-managed

9    investment options constitutes a breach of fiduciary duty.  See Taylor v. United Techs. Corp., No.

10   3:06CV1494(WWE), 2009 WL 535779, at *10 (D. Conn. Mar. 3, 2009), aff'd, 354 F. App'x 525

11   (2d Cir. 2009) (rejecting the plaintiff's argument that the defendants breached their fiduciary

12   duties where ten of the sixteen investment options offered by the plan were actively-managed and

13   plaintiff claimed that actively-managed funds generally underperform passively-managed funds).

14        Terraza has failed to plausibly allege that the Defendants breached their duty to diversify.

15        **D.  Knowing Breach of Trust**

16        Defendants move to dismiss Terraza's claim for knowing breach of trust because it is

17   derivative of her deficient claim for breach of fiduciary duty.  ECF No. 46 at 31.  Because Terraza

18   has stated a claim for breach of fiduciary duty, as explained above, the Court denies the motion to

19   dismiss her derivative claim for knowing breach of trust.

20                                    **CONCLUSION**

21        The Court denies the motion to dismiss Terraza's complaint.

22        IT IS SO ORDERED.

23   Dated:  March 13, 2017

24

25                                    _____
                                                  JON S. TIGAR
26                                        United States District Judge

27

28

United States District Court
Northern District of California