1  Kolin C. Tang
2  Ronald S. Kravitz
   Shepherd Finkelman Miller
    & Shah, LLP
3  201 Filbert Street, Suite 201
   San Francisco, CA 94133
4  Telephone: (415) 429-5272
   Facsimile: (866) 300-7367
5  Email: rkravitz@sfmslaw.com
           ktang@sfmslaw.com
6
   *Attorneys for Plaintiff, the Plan, and the Class*
7
   [Additional Counsel Listed On Signature Page]
8

9          **IN THE UNITED STATES DISTRICT COURT**

10         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11 MARIA KARLA TERRAZA,                )  Case No. 3:16-cv-03994-JST
   Individually and On Behalf of the   )
12 SAFEWAY 401(K) PLAN,                 )
                                        )  **THIRD AMENDED COMPLAINT**
13                                      )
                    Plaintiff,          )  Class Action Complaint
14          v.                          )
                                        )
15 SAFEWAY INC., BENEFIT PLANS          )
   COMMITTEE SAFEWAY INC. n/k/a         )
16 ALBERTSONS COMPANIES                 )
   RETIREMENT BENEFIT PLANS             )
17 COMMITTEE, PETER J. BOCIAN,          )
   DAVID F. BOND, MICHAEL J.            )
18 BOYLAN, ROBERT B. DIMOND,            )
   LAURA A. DONALD, DENNIS J.           )
19 DUNNE, ROBERT L. EDWARDS,            )
   BRADLEY S. FOX, BERNARD L.           )
20 HARDY, RUSSELL M. JACKSON,           )
   PEGGY JONES, SUZ-ANN KIRBY,          )
21 ROBERT LARSON, MELISSA C.            )
   PLAISANCE, PAUL ROWAN,               )
22 ANDREW J. SCOGGIN and                )
   AON HEWITT INVESTMENT                )
23 CONSULTING, INC.,                    )
                                        )
24                  Defendants.         )
                                        )
25

26                  **I.    INTRODUCTION**

27         1.    Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, upon consent of

28 the below-named Defendants, Plaintiff, Maria Karla Terraza ("Plaintiff"), individually and on

behalf of the Safeway 401(K) Plan (the "Safeway Plan" or the "Plan"), Dennis Lorenz, and all other Plan participants, brings this action under 29 U.S.C. § 1132 on behalf of the Plan against Defendants, Safeway Inc. ("Safeway"), the Benefit Plans Committee Safeway Inc. n/k/a Albertsons Companies Retirement Benefit Plans Committee, Peter J. Bocian, David F. Bond, Michael J. Boylan, Robert B. Dimond, Laura A. Donald, Dennis J. Dunne, Robert L. Edwards, Bradley S. Fox, Bernard L. Hardy, Russell M. Jackson, Peggy Jones, Suz-Ann Kirby, Robert Larson, Melissa C. Plaisance, Paul Rowan, Andrew J. Scoggin and Aon Hewitt Investment Consulting, Inc. (collectively, "Defendants"), for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*

2.     Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (*i.e.,* 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment under-performance.

3.     The importance of defined contribution plans to the United States retirement system has become increasingly pronounced as employer-provided defined benefit ("DB") plans have become increasingly rare as an offered and meaningful employee benefit.

4.     With more than $1.9 billion in assets, the Plan is in the top one percent (1%) of 401(k) plans in terms of assets.  The marketplace for 401(k) retirement plan services is well established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.  Billion dollar defined contribution plans, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of 401(k) plans and the investment of 401(k) assets.  As fiduciaries to the Plan, Defendants are obligated to act for the

exclusive benefit of participants, invest the assets of the Plan in a prudent fashion and ensure that Plan expenses are fair and reasonable.  At all pertinent times, as explained below, Defendants: (a) were fiduciaries under ERISA; (b) breached their fiduciary duties under ERISA by failing to fully disclose to participants the expenses and risks of the Plan's investment options; (c) breached their fiduciary duties under ERISA by allowing unreasonable expenses to be charged to participants for administration of the Plan; and (d) breached their fiduciary duties under ERISA by selecting and retaining opaque, high-cost, and poor-performing investments instead of other available and more prudent alternative investments.

5.     To remedy these fiduciary breaches and other violations of ERISA, Plaintiff, individually and on behalf of the Plan and Plan Participants, brings this action under Section 502, 29 U.S.C. §1132, and Section 409 of ERISA, 29 U.S.C. §1109, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate and just under all of the circumstances.

6.     Plaintiff specifically brings this action on behalf of the Plan and all other Plan participants  under ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, to recover the following relief:

- A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

- Equitable, legal or remedial relief for all losses and/or compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.   THE PARTIES

7.     Plaintiff was a participant under 29 U.S.C. §1002(7) of the Safeway Plan, which

-3-

is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).  Plaintiff is a resident of Salinas, Monterey County, California. The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102, and serves as a vehicle for retirement savings and to produce retirement income for employees of Safeway, excluding those employees who are eligible to participate in the Dominick's Finer Foods, LLC 401(k) Plan or the Vons Companies, Inc. Pharmacists' 401(k) Plan of Safeway's subsidiaries and/or affiliates.  Retirement income generated by the Plan depends upon contributions made on behalf of each employee by Safeway, deferrals of employee compensation and employer matching contributions, and from the performance of the Plan's investment options (net of fees and expenses).  Safeway established a trust (the "Master Trust") to hold participant and employer contributions and such other earnings, income and appreciation from Plan investments, less payments made by the Plan's trustee, to carry out the purposes of the Trust, in accordance with 29 U.S.C. § 1103.  As of December 31, 2014, the Plan was one of the country's largest 401(k) plans, with more than $1.9 billion in total assets and over 36,000 participants with account balances.  As of December 31, 2015, the Plan still had total assets of almost $1.8 billion.

8.  Dennis M. Lorenz ("Lorenz") is a Class Representative and also was a participant of the Safeway Plan.  Lorenz is a resident of California.  Lorenz filed a related action in the Northern District of California, Oakland Division on August 25, 2016, *Lorenz v. Safeway Inc., et al.*, No. 3:16-cv-04903-JST.  On November 14, 2016, the *Lorenz* case was found to be related to this case and was reassigned to the Honorable Judge Tigar, also presiding over this action.

9.  Defendant, Safeway, is a corporation organized and existing under the laws of Delaware, with its principal place of business in Pleasanton, Alameda County, California. Safeway is the Plan sponsor, Plan Administrator, a designated fiduciary of the Plan, and a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002, 1102.

10.  Defendant, the Benefit Plans Committee Safeway Inc. n/k/a Albertsons

-4-

Companies Retirement Benefit Plans Committee ("Benefit Plans Committee"), is a named fiduciary under the Plan, administers the Plan, and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002, 1102.  The Benefit Plans Committee maintains its address at Safeway's headquarters in Pleasanton, Alameda County, California.  The Benefit Plans Committee and its members are appointed by Safeway to administer the Plan on Safeway's behalf.

11.     Defendant, Peter J. Bocian ("Bocian"), is an individual who served as a member of the Benefit Plans Committee from November 2013 to November 2014, and who served as Chairman of the Benefit Plans Committee from December 2013 to November 2014.

12.     Defendant, David F. Bond ("Bond"), served as a member of the Benefit Plans Committee from March 2010 to November 2014.

13.     Defendant, Michael J. Boylan ("Boylan"), served as a member of the Benefit Plans Committee from March 2010 to November 2015, and served as the Secretary of the Benefit Plans Committee from December 2011 to November 2015.

14.     Defendant, Robert B. Dimond ("Dimond"), has been a member of the Benefit Plans Committee since June 2015.

15.     Defendant, Laura A. Donald ("Donald"), has been a member of the Benefit Plans Committee since May 2016.

16.     Defendant, Dennis J. Dunne ("Dunne"), served as a member of the Benefit Plans Committee from November 2013 to February 2016.

17.     Defendant, Robert L. Edwards ("Edwards"), served as a member of the Benefit Plans Committee member from March 2010 to September 2013 and served as Chairman of the Benefit Plans Committee from March 2010 to June 2013.

18.     Defendant, Bradley S. Fox ("Fox"), served as a member of the Benefit Plans Committee from March 2010 to November 2014.

19.     Defendant, Bernard L. Hardy ("Hardy"), served as a member of the Benefit Plans Committee from March 2010 to November 2014.

20.     Defendant, Russell M. Jackson ("Jackson"), served as a member of the Benefit Plans Committee from March 2010 to November 2014.

21.     Defendant, Peggy Jones ("Jones"), has been a member of the Benefit Plans Committee since May 2016.

22.     Defendant, Suz-Ann Kirby ("Kirby"), has been a member of the Benefit Plans Committee since February 2016.

23.     Defendant, Robert Larson ("Larson"), has been a member of the Benefit Plans Committee since May 2016.

24.     Defendant, Melissa C. Plaisance ("Plaisance"), served as a member of the Benefit Plans Committee from March 2010 to November 2014.

25.     Defendant, Paul Rowan ("Rowan"), served as a member of the Benefit Plans Committee from June 2015 to November 2015.

26.     Defendant, Andrew J. Scoggin ("Scoggin"), has been a member of the Benefit Plans Committee since June 2015.

27.     Defendants, Benefit Plans Committee, Bocian, Bond, Boylan, Dimond, Donald, Dunne, Edwards, Fox, Hardy, Jackson, Jones, Kirby, Larson, Plaisance, Rowan and Scoggin are referred to collectively hereafter as the "Benefit Plans Committee" or the "Benefit Plans Committee Defendants."

28.     Defendant, Aon Hewitt Investment Consulting, Inc. f/k/a Hewitt Ennis Knupp or HEK ("Aon"), is a corporation that maintains its headquarters and its principal place of business in Chicago, Illinois, while maintaining an office in San Francisco, California and significant business operations in this judicial district.  At all pertinent times, Aon served as the investment adviser for the Plan and acted as a fiduciary of the Plan.

### III.   JURISDICTION AND VENUE

29.     Plaintiff seeks relief on behalf of the Safeway Plan and Plan participants pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties

and, specifically, under ERISA Section 409, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

30.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).  The Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the matter in controversy, upon information and belief, exceeds $5,000,000, exclusive of interests and costs, and this is a class action in which Class Members and Defendant are citizens of different states.

31.     Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Safeway's principal place of business is in this district.  Furthermore, the Benefit Plans Committee is located in this district.

## IV.   FACTUAL ALLEGATIONS

### A.   Background

#### 1.     The Safeway Plan Management Structure

32.     The Safeway Plan is a participant-directed plan in which participants direct their retirement assets into a pre-selected menu of investment offerings consisting of mutual funds, Safeway common stock,[1] common collective trusts, and a stable-value fund.

33.     Pursuant to the Safeway Plan, which was established in 1952 "for the exclusive benefit of [Safeway's] eligible employees," Safeway, as the named and designated plan administrator and fiduciary, appointed the Benefit Plans Committee "to administer the Plan on its behalf."  The Benefit Plans Committee is thus delegated with Safeway's "full discretionary authority" to "administer the Plan in accordance with the Plan and ERISA," as well as, among other things, the "full discretionary power and authority:

> i.     To engage actuaries, attorneys, accountants, appraisers, brokers, consultants, administrators, recordkeepers, custodians, physicians, or other firms or persons and (with its officers, directors and employees) to rely upon the reports, advice, opinions or valuations of any such persons except as required by law;

---

[1]The Safeway common stock investment option was eliminated effective January 2015, as explained below.

ii.   To adopt Rules of the Plan that are not inconsistent with the Plan or applicable law and to amend or revoke any such rules;

iii.  To construe and interpret the Plan and the Rules of the Plan and to remedy any ambiguities and inconsistencies therein;

iv.   To determine questions of eligibility and vesting of Participants;

v.    To determine entitlement to allocations of contributions and distributions of Participants, former Participants, Beneficiaries, and all other persons;

vi.   To make findings of fact as necessary to make any determinations and decisions in the exercise of such discretionary power and authority;

vii.  To appoint claims and review officials to conduct claims procedures...;

viii. To compute, certify to and direct the Trustee with regard to the amount and kind of benefits payable to Participants and their Beneficiaries;

ix.   To authorize all disbursements by the Trustee from the Trust Fund;

x.    To maintain all records that may be necessary for the administration of the Plan other than those maintained by the Trustee;

xi.   To delegate any power or duty to any firm or person engaged under paragraph (i) or to any other person or persons; and

xii.  To select or eliminate Investment Funds."

34.    The Safeway Plan's assets are held under the Master Trust.  All investments and asset allocation are performed through the Master Trust.

**2.     The Plan's Investment Offerings**

35.    Until on or about July 28, 2016, when the Plan changed its service provider from Great-West Life & Annuity Insurance Company d/b/a Empower Retirement ("Empower") to The Vanguard Group, Inc. ("Vanguard"), at which time Defendants belatedly began to offer a menu of investment options with expense ratios more appropriate in light of the assets in and size of the Plan, Defendants offered investments in the Plan that had grossly excessive fees by any objective standard (and paid correspondingly excessive fees to the Plan's service provider, Empower, its predecessor-in-interest, J.P. Morgan Retirement Plan Services, LLC ("J.P. Morgan"), and Defendants, in the exercise of any modicum of reasonable due diligence, knew, or

should have known, about the excessive nature of these fees at all pertinent times.  The menu of investment options that the Plan began offering on July 28, 2016 has, in many instances, fees associated with it that are 12.5% or less of the fees previously charged to Plan participants during the pertinent period (meaning from July 14, 2010 and continuing).  Defendants could have achieved these enormous costs savings throughout the pertinent period, based upon a cursory examination of the marketplace for defined contribution products but, clearly, either chose not to look or, instead, to ignore the manner in which the Plan participants were having their retirement savings slowly eroded en masse by excessive fees.

36.     Until the Plan made the change to Vanguard, Defendants engaged in virtually no significant consideration, examination or bench-marking of the costs associated with the Plan, including any evaluation of total plan cost ("TPC"), which is discussed more fully below, and did not engage in any detailed examination of whether there were better and/or less costly investment options available to the Plan and its participants or if the Plan should offer a greater complement of passively managed investments or a sufficient number of passively managed investments to permit a participant to meaningfully pursue a passive management investment strategy, as opposed to an active management investment strategy.  Indeed, Defendants only considered a handful of potential changes in the investment options offered to the Plan's participants during the pertinent period, and consistently chose not to replace poor performing and/or unnecessarily expensive investment options with more prudent alternatives despite possessing specific evidence and information that would have resulted in a prudent fiduciary replacing investment options or, at a minimum, improving and expanding the scope of investment options available to Plan participants.

37.     At all pertinent times through July 27, 2016 (except as noted below), the Plan offered the following investment options: mutual funds, separately managed accounts ("SMAs"), Safeway common stock, common collective trusts ("Common Trusts"), and the Interest Income Fund (distinct from the other Common Trusts).

-9-

38.     Mutual funds are publicly-traded investment vehicles consisting of a pool of funds collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

39.     SMAs are investment portfolios that begin with the same allocation as that of their mutual fund counterpart, but for which the professional investment adviser will make individual investment decisions that may depart from that of the mutual fund.  In essence, SMAs are mutual funds customized for that investor.  However, unlike mutual funds, SMAs do not issue registered prospectuses and, as such, their fees and other disclosures are not as transparent.

40.     The Safeway common stock investment option was eliminated from the Plan effective January 30, 2015, and the stock was liquidated due to a merger with Albertsons Companies Inc., another grocery company.

41.     Common Trusts are, in essence, mutual funds without the SEC regulation. Common Trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments.  Common Trusts were first organized under state law in 1927, and were blamed for the market crash in 1929.  As a result, Common Trusts were severely restricted, giving rise to the more transparent and publicly-trade mutual funds. Today, banks create Common Trusts only for their trust clients and for employee benefit plans like the Plan.  The main advantage of opting for a Common Trust, rather than a mutual fund, is the negotiability of the fees, so larger retirement plans are able to leverage their size for lower fees.  Unfortunately, in light of the grossly excessive fees paid by the Plan at all pertinent times relative to the fees that any reasonable or prudent fiduciary would have been willing to pay based upon the available investments in the marketplace at the time, it is clear that the Plan never leveraged its size to achieve lower or appropriate fees.

-10-

42.     The Interest Income Fund is the Plan's stable value fund, which is a capital preservation investment option that uses a Common Trust as its investment vehicle.  The Interest Income Fund invests in a mutual fund, a separate account contract, and traditional and synthetic Guaranteed Investment Contracts ("GICs").  In addition to the expense ratio charged, the Interest Income Fund earns additional internal "fees," based upon the "spread" it earns between the rate of return paid to participants and the rate of return achieved by investing participant assets on its own account.

**3.      Limited Scope Audit In 2014**

43.     The Plan's 2013 and 2014 financial statements ("2013-2014 Financials"), which were recent financial statements provided to Plaintiff and other Plan participants, indicated that Deloitte & Touche LLP ("Deloitte"), the Plan's auditor, performed only a limited scope audit of the Plan's financial statements for 2014.  In other words, Deloitte was unable to obtain sufficient audit evidence to provide a basis for an audit opinion on the 2014 financial statements.

44.     According to the "Basis for Disclaimer of Opinion" in the 2013-2014 Financials, the Plan administrator (*i.e.*, Safeway, through the Benefit Plans Committee) instructed Deloitte not to perform any audit procedures with respect to information certified by the Safeway Plan's service provider, as agent for the trustee of the Plan, except for comparing such information with the related information included in the 2014 financial statements.  Defendants represented that they obtained a certification from the trustee that the information Defendants received from the trustee was complete and accurate.  As such, Deloitte did not express an opinion of the 2014 financial statements or the supplemental schedule of assets.

45.     Apparently, Deloitte did perform a full audit of the Plan's 2013 financial statements.  It appears that the Plan moved from a full audit in 2013 to a limited scope audit ("LSA") in 2014, for some undisclosed reason.

46.     ERISA allows plan administrators to engage Certified Public Accountants to perform LSAs.  However, many commentators, including the Department of Labor ("DOL")

Inspector General, have criticized LSAs "as a major obstacle in providing audit protections for plan participants."  For decades, the DOL Inspector General has sought repeal of the LSA exemption in ERISA.  *See* http://www.oig.dol.gov/public/reports/oa/2012/09-12-002-12-121.pdf.

47.     When an auditor is engaged to perform a full-scope audit, everything in the plan is subject to audit testing.  However, when performing an LSA of the financial statements, the auditor need not perform any auditing procedures with respect to investment information prepared and certified by a qualified bank or similar institution, or by an insurance carrier.  To be qualified, a bank or insurance carrier must act as a trustee or custodian for the plan, be state or federally chartered and be regulated, supervised and subject to periodic examination by a state or federal agency.  Additionally, the trustee or custodian must certify as to the accuracy and completeness of the investment information.

48.     LSAs are especially risky (and likely inappropriate) where the trustee is certifying non-publicly traded investments, such as collective trusts and SMAs, which consist of the majority of the assets in the Safeway Plan.  And, it is worse still, where, as here, the trustee is certifying the values of its own proprietary funds that are not publicly traded.

49.     In short, as discussed below, virtually all investment balances and investment information are unaudited.  Defendants' decision to permit the investments of the Plan to go unaudited is inexplicable in light of the size of the Plan and the fact that the Plan previously was audited.  Defendants' decision to utilize an LSA in connection with a Plan with almost $2 billion in assets is, at best, reckless, and raises a significant "red flag" with respect to the seriousness with which Defendants approached their duties to the Plan.

**B.     Defendants' Breaches Of Fiduciary Duty**

50.     Defendants have severely mismanaged the Plan in a myriad of ways detailed below.  Defendants' failure to monitor the investments in the Plan to ensure that they provided adequate available returns and were not excessively priced, as were the vast majority of the investments in the Plan, constitutes breaches of fiduciary duty.  Indeed, the Safeway Plan is an

-12-

enormously expensive plan in terms of total plan cost when compared to defined contribution

retirement plans of a similar size.  Total plan cost ("TPC") is "the combination of explicit and

implicit expenses that employers and employees pay for their defined contribution plan." *See*

*Doing Your Homework: Understanding 401(k) Fees and Making Every Basis Point Count*

(Benefits Quarterly; Fourth Quarter 2010)(Hewitt Associates).  In fact, at all pertinent times, the

Plan's TPC has been 2-3 times more expensive than the average TPC for defined contribution

plans with assets of more than $1 billion.  Defendants knew, or should have known, through the

exercise of any modicum of reasonable diligence that the Plan was paying grossly excessive fees.

Based upon the Plan's design, participants in the Plan pay virtually all of these excessive fees

and, as a result, achieve significantly lower retirement savings, since these excessive fees,

especially when compounded, have a devastating impact upon participant retirement savings.

51.     As a reflection of the enormous overpayments that Defendants were permitting

the Plan to make to Empower (the successor to J.P. Morgan) in terms of TPC, an analysis

conducted in 2016 regarding a change from Empower to Vanguard (while keeping a number of

expensive and underperforming investment options still available within the Plan) demonstrated

that TPC could be reduced by 32.6% with the costs of the Plan reduced by over 33% and more

than $2.5 million is savings per annum.  Savings of this kind could have easily been obtained on

behalf of the Plan through the exercise of reasonable diligence by Defendants throughout the

pertinent period and thereby reduced the excessive participant fees [in the form of either direct

payments of up to $65-$67 per participant or revenue sharing payments (discussed more fully

below) that were being used indirectly in the place of such fees based upon estimates, as opposed

to dollar-for-dollar crediting] that were used to pay the expenses of the Plan.

52.     At all pertinent times, Safeway and the Benefit Plans Committee were responsible

for selecting and monitoring the investments, while Aon was responsible for offering investment

advice to Safeway and the Benefit Plans Committee, as well as bench-marking and evaluating the

fees and expenses charged to the Plan and paid by the participants.  Defendants breached their

fiduciary duties by imprudently failing to evaluate and monitor the fees charged directly and indirectly to the Plan and its participants, and by failing to ensure that such fees were fair and reasonable under all of the circumstances.

53.     At all pertinent times, the Benefit Plans Committee, Safeway and Aon were responsible for offering prudent and sound advice with respect to the investments offered to participants of the Plan in the sole interest of the Plan participants, disclosing necessary information such that the Plan participants could make informed decisions, and ensuring that the fees and expenses charged with respect to these investments were fair and reasonable. Defendants breached those fiduciary duties.

54.     At all pertinent times, Defendants were legally responsible for monitoring the advice and services provided by the Plan's service providers.  In light of the apparent breaches of fiduciary duty in terms of both poor investment options, blatantly excessive fees, and undisclosed conflicts and fees, it is apparent that all Defendants breached those fiduciary duties.

55.     As a participant in the Plan, Plaintiff directed that her contributions to the Plan be allocated to certain investment options made available to her by Defendants, including the Interest Income Fund, the PIMCO Bond Fund, the JPMCB SmartRetirement Passive Blend 2025 C-20 Fund, the Dodge & Cox Stock Fund, the Wells Fargo Advantage Large Cap Growth-Inst Fund, the Emerald Growth-Inst. Fund, the RS Small Cap Value Portfolio Fund, the SSgA S&P 500 Indx-NL-A Fund, Safeway Co. Stock, and the American Funds EuroPacific Growth-R5 Fund.  Plaintiff did not have knowledge of the costs and performance of the Plan's investments, as compared to other available alternatives for similarly-sized defined contribution plans, or information regarding other available share classes for the Plan's mutual fund or other investments (including information about which share classes charged lower expense ratios), information regarding the SMAs and Common Trusts (including whether these instruments had layered fees that rendered their expense ratios illusory and/or understated), or information regarding the actual/effective fees charged by the Interest Income Fund (including the spread

earned by the Interest Income Fund) until shortly before this lawsuit was filed.  Plaintiff also did not have knowledge of the acts or omissions of Defendants or the process (or lack thereof) by which Defendants evaluated and chose available investment options for the Plan and monitored the fees and expenses incurred by the Plan and its participants.

**1.    Overwhelming Majority Of Unregistered Investment Options Lacking Prospectuses**

56.    As of December 31, 2014, the Plan's Common Trusts investment options were the following so-called "target date" funds, as well as one "index" fund:

Retirement Income

i.      JPMCB SmartRetirement Passive Blend Income-C20

ii.     JPMCB SmartRetirement Passive Blend 2015-C20

iii.    JPMCB SmartRetirement Passive Blend 2020-C20

iv.     JPMCB SmartRetirement Passive Blend 2025-C20

v.      JPMCB SmartRetirement Passive Blend 2030-C20

vi.     JPMCB SmartRetirement Passive Blend 2035-C20

vii.    JPMCB SmartRetirement Passive Blend 2045-C20

viii.   JPMCB SmartRetirement Passive Blend 2050-C20

Stocks-Large Blend

ix.     SSgA S&P 500 Index NL-A

57.    As of December 31, 2014, the Plan's mutual fund investment options were the following:

Stocks-Large Value

i.      Dodge & Cox Stock (DODGX)

Stocks-Large Growth

ii.     Wells Fargo Advantage Large Cap Growth-Inst (STNFX)

Stocks-Small Growth

iii.    Emerald Growth-Inst (FGROX)

Foreign Large Growth

iv.    American Funds EuroPacific Growth-R5

58.    As of December 31, 2014, the Plan's SMA options were the following:

Bonds

i.    PIMCO Bond Fund


Stocks-Small Growth

ii.    RS Small Cap Value Portfolio

59.    As indicated above, excluding Safeway common stock, nine of the 15 riskier investment options were opaque Common Trust vehicles,[2] with two of the remaining six options non-transparent SMAs.[3]  In all, only four of the 16 options were mutual funds.  And, even discounting the Retirement Income investment options (*i.e.*, the target date funds), half of the remaining six stock or bond investment options were either SMAs or Common Trusts. Moreover, the Retirement Income investment options (*i.e.*, the JPMCB SmartRetirement Passive Common Trusts -- *i.e.,* the target date funds) are the default for the Plan, which pushes Plan participants to place their retirement assets with these expensive, poor performing investment vehicles.

60.    The excessively priced and poorly performing investment options, which were exceptionally limited in number and virtually lacking in the necessary complement of passively managed mutual funds or other investments to make the Plan's investment portfolio appropriately diversified based upon any reasoned fiduciary review, remained essentially

_____

[2]As discussed above, *supra* Section IV.A.2, Common Trusts are not required to file a prospectus or registration statement with the SEC.

[3]As discussed above, *supra* Section IV.A.2, an SMA, while identical to a mutual fund in its initial disposition, varies its investment portfolio as time progresses.  No prospectus or registration statement is filed for the SMA, which means that there are no regular reports as to the current allocation of the SMA's investment portfolio.

unchanged throughout the pertinent period.  Beyond changing the available target date funds between 2010 and 2011, changing the offering of one large cap fund during that same period and making a few modest "share class" changes to reduce expense ratios modestly (which changes achieved minimal savings, as compared to the savings available in the marketplace at the time, based upon a reasoned review by any competent fiduciary), the investments in the Plan remained virtually unchanged and continued to pay excessive fees for poor investments throughout the pertinent period until the Plan switched from Empower to Vanguard this past summer after the initial Complaint was filed.  The modest changes by Defendants until this past summer are damning in their very nature.  Although the changes appear to indicate an awareness of the critical need to examine fees in the marketplace, the minimal nature of the changes also reflects that virtually no due diligence could have been performed regarding available investment options and the fees that should be charged to retirement plans with the assets and purchasing power of the Plan.

61.     Defendants' act in offering these opaque investment options and the Plan's concentration of investments in such options did not alone amount to any breach of fiduciary duty.  Rather, Defendants' decisions to offer these opaque investment options, coupled with the fact that they were expensive when compared to their mutual fund counterparts (when they are supposed to be designed to be exactly the opposite) and poor performing when compared to their benchmarks and other available investments, along with the fact that they failed to offer any meaningful manner for a participant to diversify his or her investments and avoid the dubious approach of investing in actively managed mutual funds that attempt (but regularly fail) to beat the market, as discussed below, and were not accompanied by fulsome disclosures regarding their investment objectives and other risk factors (discussed below), all coupled together resulted in the breaches of fiduciary duty associated with these investment options.

**2.      The Absence of Available Passive Investment Options**

62.     In connection with a review of the Plan in March 2016 prior to the transition to

Vanguard, Aon specifically and essentially acknowledged that a traditional three tiered structure of a well diversified defined contribution plan requires that the following investment alternatives be offered: (a) a qualified default investment alternative ("QDIA") typically in the form of a target date fund for participants with a lack of interest, knowledge or time to create their own diversified portfolio; (b) passive funds in the form of a low cost tier of index funds for participants who wish to construct their own asset allocation without the added cost and risk of active management; and (c) actively managed funds for participants who are comfortable making their own asset allocation decisions and wish to employ an active management strategy.  In acknowledging this traditional three tiered structure, based upon Aon's own 2013 study, *Trends and Experience in Defined Contribution Plans*, Aon asserted that 66% of defined contribution plans in the United States are structured this way, while falsely categorizing the Plan as a defined contribution plan that had adopted this accepted three tiered approach.  Since the Plan only offered one passive investment option in the form of the underperforming and expensive, SSgA S&P 500 Index NL-A, the Plan obviously did not offer participants an opportunity to engage in asset allocation based upon choosing a low cost tier of index *funds* (meaning in the plural), thereby confirming that, based upon Aon's own analysis, the Plan was not appropriately diversified and effectively deprived Plan participants of the opportunity to pursue a passive investment strategy, despite the overwhelming evidence that such a strategy favors the vast majority of participants in defined contribution plans, including the Plan itself.  Jeff Brown, *Do Actively Managed Funds Really Pay Off For Investors?* (April 14, 2016) (U.S. News & World Report), http://money.usnews.com/investing /articles/2016-04-14/ do-actively-managed -funds-really-pay-off-for-investors ("A year-end study by S&P Dow Jones Indices found that 'over the 10-year investment horizon, 82.14 percent of large-cap managers, 87.61 percent of mid-cap managers, and 88.42 percent of small-cap managers failed to outperform (their index benchmarks) on a relative basis.'  Appeal for the human touch.  But most investment dollars remain in managed funds, so what is their appeal?  Many observers say managed funds survive

-18-

through salesmanship. Because their higher fees produce bigger profits for fund companies, the firms keep pitching them, these critics say"); Kwak, *Improving Retirement Savings Options For Employees*, 15:2 U. Pa. J. Bus. Law. 483, 512-529 (2013)(explaining why the law of trust and ERISA favors, at a minimum, a presumption in favor of offering index funds, as opposed to actively managed funds).

63.     During the pertinent period, although, on limited occasions, Defendants referenced the possibility of adding passively managed funds to the compliment of investment options available within the Plan and/or the possibility of replacing poorly performing actively managed funds with passively managed funds, Defendants never engaged in any serious analysis or deliberations with respect to the potential benefits or prudence of doing so.  At a minimum, Defendants' failure and refusal to even consider providing participants with the opportunity to invest their retirement savings in passively managed funds (a strategy acknowledged by the Plan's investment adviser as a traditional offering to defined contribution retirement plans in the United States) was a breach of fiduciary duty.

64.     Throughout the pertinent period, Defendants were aware of the potential benefits of passive management, as opposed to active management, but engaged in no serious deliberations about the wisdom of doing so and literally did nothing to provide Plan participants with an opportunity to avoid actively managed funds and the expenses and risks associated with them.  During part of the pertinent period, Aon provided limited periodic reporting to Safeway and the Benefit Plans Committee regarding the performance of actively managed funds, as opposed to passively managed funds, in the form of a so-called "active management report card." This "report" however, only addressed comparative performance of actively managed funds vs. passively managed funds in a cursory manner based on industry averages, as opposed to the actual investments in the Plan, and provided such limited information in terms of longitudinal performance (*i.e.*, for the previous quarter and year to date but with no metrics as to long-term performance) so as to make the report meaningless, or even worse.  In sum, Aon provided

Safeway and the Benefit Plans Committee with "snap shot" reporting of generalized data

regarding actively managed funds, as compared to passively managed funds, which had the effect

of creating ambiguity and misinformation regarding the performance of actively vs. passively

managed investments and thereby supported the active management investment strategy

explicitly and implicitly endorsed by Aon through its investment choices, while effectively

masking the truth about the long-term underperformance of virtually all actively managed

investments, when compared to passively managed investments, which is entirely consistent with

"efficient fund hypothesis" and to be expected based upon "efficient market hypothesis."

www.forbes.com/sites/rickferri/2012/04/10/the-efficient-fund -hypothesis/#294e4e867ba1.  Any

responsible and prudent investment adviser or fiduciary should have been familiar and

conversant with these principles and, at a minimum, should consider their impact in determining

a complement of diversified investment options to be offered to participants.  Of course, since

the Plan is a retirement savings vehicle, long-term performance of available investments is one of

the most important factors to be considered on behalf of the Plan and by Defendants.  Thus,

through its incomplete and misleading reporting, Aon encouraged an investment strategy that

failed to consider or offer an opportunity to participants to pursue a passive management

investments strategy through an appropriately diverse menu of investment options if a participant

chose to pursue such an investment strategy, which Aon itself has explicitly acknowledged is an

acceptable and reasoned manner in which Plan participants may (and perhaps should) elect to

invest their retirement savings.

65.    Throughout the pertinent period, Defendants did not offer Plan participants an

appropriate complement of passively managed mutual funds to render the investment options

sufficiently diverse or reasonable.  Instead, Defendants consistently offered Plan participants a

number of actively managed mutual funds or their equivalents in the form of Common Trusts or

SMAs ("active funds"), which attempt to beat the market by requiring investors to pay fees to

have an expert manage their investment funds (and for which higher fees are almost always

charged).  However, research has consistently found that active funds rarely ever do better than their alternative, passively managed counterparts ("passive funds" or "index funds"). Passive funds attempt to imitate the performance of a market index, such as the S&P 500, by buying all the securities that make up the index. Therefore, passive funds should provide gross investment returns that are very close to those of the market segment tracked by the index with relatively low costs to the plan's participants.  Most existing literature comparing active funds to passive funds has found that active funds fail to achieve what they set out to do. According to certain studies, fund managers for active funds generally make inadequate selections of stocks and their market timing skills are not efficient enough to outperform the market return. In fact, studies consistently show that the raw return of active funds is lower than that of passive funds. *See also* http://www.nytimes.com/2014/07/20/your-money/who-routinely-trounces -the-stock-market-try-2-out-of-2862-funds.html?  Indeed, in recent communications to Plan participants, Defendants have effectively conceded that the investment options that they previously offered to Plan participants before switching to Vanguard this summer were inappropriate and not sufficiently diverse.

66.     The skewed investment option selection offered by Defendants throughout most of the pertinent period translated into the Master Trust's allocation of Plan assets as well.  For example, as of December 31, 2014, over **a third** of the Plan's $1.9 billion in assets were placed in the opaque Common Trusts and over **48%** were placed in Common Trusts or SMAs, not including the Common Trusts within the Interest Income Fund:

- Mutual Funds:                                                    $442.5 million
- SMAs:                                                                $284.7 million
- Safeway Common Stock:                                   $195.6 million
- Common Trusts (outside of Interest Income Fund):   $659.3 million
- Interest Income Fund:                                        $417.7 million

67.     And, of the Plan assets in the Common Trusts, $244.8 million was placed in the

-21-

default Retirement Income investment options (*i.e.*, the JPMCB SmartRetirement Passive

Common Trusts), which "target date" funds are very opaque, as discussed further below.

### 3.    Undisclosed Expenses, Fees, And Risks

68.    The Plan's predisposition for unregistered and opaque investment options matches

the lack of full disclosure of information material to Plan participants, which is indicative of

Defendants' approach to their fiduciary duties.  When Empower succeeded to J.P. Morgan, the

revenue sharing disclosures changed from misleading to false, since they now asserted that

Empower or its affiliates received revenue sharing payments "for providing recordkeeping,

distribution and administrative services," even though that statement is patently untrue, since

Empower provides the same exact services to all of its plan customers regardless of whether it

receives revenue sharing payments and the amount of revenue sharing payments bear no

relationship whatsoever to the value of the services rendered.   In sum, the revenue sharing

disclosures provided by Defendants to Plan participants were, at best, meaningless and, at times,

entirely misleading in nature.  It appears that, with the switch from Empower to Vanguard, a

significant amount of the mischief associated with revenue sharing payments has been eliminated

from the Plan, the excessive fees paid by the Plan to Empower during the pertinent period have

been reduced (if not eliminated), and all participants now pay comparatively transparent direct

fees.

69.    ***Administrative Expenses And Expense Reimbursement.***  According to the 2013-

2014 Financials,[4] for example, "[p]ayment for Plan administrative expenses is paid in part by the

investment funds based on revenue sharing agreements between the Plan and the investment

funds." In the retirement plan industry, revenue share agreements are very rarely between the

---

[4]References to the 2013-2014 Financials and the investment lineup as of December 31,
2014 for illustrative purposes.  At all times during the pertinent period, Safeway's disclosures
and other documents related to the Plan suffered from the same infirmities and lack of
transparency, while the investments offered within the Plan, at all pertinent times, were not
sufficiently diverse and were excessively priced by any objective measure.

plan and the investment funds.  Instead, these agreements are almost always between the recordkeeper and the investment funds, which is reflected by a later disclosure in the 2013-2014 Financials that the recordkeeper, "or one or more of its affiliates, may receive a fee from the investment option provider for providing certain recordkeeping, distribution and administrative services."  To the extent that the Plan received some credits during the pertinent period associated with revenue sharing payments, it does not appear that, for a significant period of time at issue, the Plan received full, dollar-for-dollar crediting as required by guidance from the DOL.  Moreover, the Plan never has engaged in any effort to rebalance revenue sharing payments to engage in fee equalization for participants and, as a result, participants in expensive investments that pay more in terms of revenue sharing payments indirectly subsidize those participants who choose less expensive investment options that pay little or no revenue sharing payments.  None of the Defendants ever disclosed or recommended disclosure of this important and material information regarding the manner in which the Plan effectively discriminates against one class of participants in favor of another class of participants, and should result in participants choosing investments in lower cost index funds if those facts are made available to them.

70.     ***Exempt Party-In-Interest Transactions.***  According to the 2013-2014 Financials:

> Certain Plan investments are managed or ***significantly influenced*** by J.P. Morgan Chase Bank N.A., trustee of the Plan.  As J.P. Morgan Retirement Plan Services provides recordkeeping services to the Plan, these transactions quality as party-in-interest transactions until the third quarter 2014 acquisition of JP Morgan Retirement Plan Services by Great West Financial® (see Note 1).  Administrative fees paid to J.P. Morgan Retirement Plan Services for recordkeeping were $759,556 in 2014 and $1,144,220 in 2013.

(Emphasis added.)

71.     While it is clear that the JPMCB SmartRetirement Passive Blend Common Trusts are managed by J.P. Morgan Chase Bank N.A. (together, with J.P. Morgan, hereafter "JPMCB"), the exact nature, extent, and identity of investment options "significantly influenced" by JPMCB is unclear and, upon information and belief, the relationship and influence inappropriately affected and compromised the Plan's investment options.  JPMCB has a notorious history of

1  engaging in unlawful product-steering practices to influence its customers to invest in its own

2  proprietary funds and, upon information and belief, JPMCB engaged in the same or similar

3  practices with respect to the Plan, and Defendants allowed those practices to occur without

4  addressing or remedying them.

5         72.    ***JPMCB SmartRetirement Passive Common Trusts.***  Even though the JPMCB

6  SmartRetirement Passive Common Trusts are called "Passive," these Common Trusts combine

7  both actively managed and indexed strategies, which is misleading to participants who prefer

8  passive management.  The proper name should be "Passive/Active."

9         73.    Further, there does not appear to be any guideline specifying the percentage of

10  assets that will be passively managed, nor does there appear to be any guideline regarding the

11  percentage of assets in these funds of funds that will be invested in JPMCB-affiliated funds

12  versus funds maintained by unaffiliated banks and trust companies.  However, the 12/31/15 Fact

13  Sheets, which are available online, disclose that, for example: the 2020 Common Trust was 45%

14  invested in Northern Trust Index funds and 55% apparently in JPMCB-affiliated funds; the 2030

15  Common Trust was 60% invested in Northern Trust Index funds and 40% in JPMCB-affiliated

16  funds; and the 2050 Common Trust was 72% invested in Northern Trust Index Funds and 28%

17  apparently invested in JPMCB-affiliated funds.

18         74.    The exact expense ratios for these Common Trusts are also unclear.  The gross

19  expense ratios of these Common Trusts (.47%-.50%) included in the Default Notice section of

20  the 2013-2014 Financials are noted, as the "funds' total annual operating expense ratios, gross of

21  any fee waivers or expense reimbursements."  The Default Notice section also provides, in an

22  endnote, that the "JPMCB SmartRetirement Funds indirectly bears its proportionate share of the

23  operating expenses of any underlying funds in which it may invest (excluding management fees

24  and services fees) . . . "the Trustee of the JPMCB SmartRetirement Funds agrees to reimburse the

25  Fund for such fund operating expenses . . . [to the extent they] exceed 0.04%."  And, putting

26  aside the undisclosed or not necessarily determinable fees, the disclosed fees were grossly

27

28                                              -24-

excessive in light of the size and bargaining power of the Plan and the availability of a number of less expensive and comparable investments.

75.     According to public information available from JPMCB online:

When you select a SmartRetirement Passive Blend Fund, you're automatically invested in more than 15 underlying funds across two asset classes - stocks and bonds.  By investing in the fund, a team of more than 100 investment professionals at J.P. Morgan is responsible for shifting the allocation from stocks to bonds as the fund approaches its target date. This way your fund automatically changes to become more conservative as you approach your target retirement date.

https://www.jpmorgansmartretirement.com/passiveblend/SR2030.  However, JPMCB then goes on to warn that, "the gross expense ratio of the fund includes the *estimated* fees and expenses of the underlying funds. *There may be additional fees associated with investing in a Fund of Funds strategy*." *Id.* (Emphasis added.)

76.     These "additional fees" associated with a fund of funds, especially with one managed by JPMCB, may be significant.  Without a prospectus or a complete audit, the actual, rather than estimated, total expense ratio is unavailable.  Thus, it is impossible to determine the true nature of the fees and expenses, while the disclosed fees are grossly excessive on their face.

77.     ***Concentration Of Risk.***  The Plan's financial statements for the year ended December 31, 2014 disclosed a "Concentration of Risk," wherein the Master Trust's investments included a mutual fund with a year-end fair value of $157.3 million, of which the Master Trust held a 65.2% beneficial ownership of the outstanding institutional shares.  The identity of this mutual fund is, however, undisclosed and indiscernible based on the information provided in the financial statements.  As a result, it is impossible to determine if inclusion of that mutual fund unbalances the risk allocation of the Plan's investment options as a whole, and participants were not fully informed of that investment option's risk, thereby placing the diversification of the Plan's investment options and available investment options at risk.  Since Plan participants did not receive adequate or necessary information regarding this concentration of risk within the Plan, they could not have made informed decisions about their investments in the Plan.

78.   ***The Safeway Common Stock Fund.***  There was no meaningful information supplied to Plan participants regarding Safeway's common stock fund (when it was offered within the Plan), such as whether an investment manager was appointed, the use or availability of short-term holdings (*e.g.*, percentage of cash in the JPMCB money market fund), performance (inclusive of any cash drag/bump on stock performance), or fee information.  Without this information, it was impossible for participants to properly scrutinize the integrity of this investment option and/or whether they should be investing in the Safeway Common Stock Fund. And, since Plan participants did not receive adequate or necessary information regarding this concentration of risk within the Plan, they could not have made informed decisions about their investments in the Plan.

### 4.   The Underperformance And Excessive Fees Of The Investment Options

79.   Notwithstanding the lack of transparency of the selection of investment options and lack of disclosures regarding certain material information, which makes scrutiny of the true and full nature of fees and  expenses, as well as investment options, virtually impossible, the information that is available indicates that the Plan and its participants were required to pay excessive fees for the mutual funds and other investment options during the pertinent period. These fees are, on their face, unreasonable in many instances and often are multiples higher than the amounts they should be (when compared to the expense ratios that would be associated with typical mutual fund share classes held in retirement plans assets of the same or similar size of the Safeway Plan), based upon the market and negotiating power of the Plan at the time that these investment options were offered.  As indicated below, during the pertinent period, almost all of the investment options either underperformed compared to their benchmark, were significantly more expensive than their Vanguard peers, or both.

80.   ***The PIMCO Bond Fund SMA.***  The PIMCO Bond Fund SMA not only underperformed relative to its benchmark, but was more expensive relative to its peer.  For the year ended December 31, 2014, the PIMCO Bond Fund had a 1.64% return rate, significantly

lower than the Barclays Capital U.S. Aggregate Bond Index (BarCap US Agg Bond) benchmark of 2.02% for the same period.  During the same period, the PIMCO Bond Fund charged an expense ratio of 46 basis points (0.46%), while the expense ratio for Admiral Shares of the Vanguard Total Bond Market Index Fund, which tracks the BarCap US Agg Bond, was 7 basis points (.07%).  In other words, despite its underperformance, the PIMCO Bond Fund charged 39 basis points (0.39%), or *six times more* than its peer, the Vanguard Total Bond Market Index Fund.  All of this information was known and/or available to Defendants each and every year during the pertinent period when they maintained this costly and unreasonable investment option in the Plan.

81.     ***The JPMCB SmartRetirement Passive Blend Common Trusts.***  Of the eight JPMCB SmartRetirement Passive Blend Common Trusts presented to Plan participants, only one – the JPMCB SmartRetirement Passive Blend Income – has outperformed its benchmark since inception.  Meanwhile, their expense ratios range from 47 basis points (.47%) to 50 basis points (.50%), which is significantly higher than their Vanguard counterparts that had an average expense ratio of 17 basis points (.17%) as of December 31, 2014.  Indeed, the expense ratios of the Blackrock index fund investment options that replaced the JPMCB SmartRetirement Passive Blend Common Trusts (*i.e.,* the target date funds) when the Plan moved from Empower to Vanguard earlier this year, have expense ratios of 5.6 basis points -- over 87.5% less expensive. All of this information was known and/or available to Defendants each and every year during the pertinent period when they maintained these costly and unreasonable investment options in the Plan.

82.     Moreover, the Plan's share class for the JPMCB SmartRetirement Passive Blend Common Trusts was not even the least expensive share class available.  The Plan offered the C20 share class, which, as of March 31, 2016, had an expense ratio of either 45 or 46 basis points (.45% or .46%).  This is significantly higher than the other two classes: the CF share class charged either 25 or 26 basis points (.25% or .26%), while the CF10 class charged either 35 or 36

-27-

basis points (.35% or .36%).  In other words, on top of the fact that the JPMCB SmartRetirement

Passive Blend Common Trusts are objectively overpriced, Defendants did not even secure the

least expensive share class available, despite the Safeway Plan's size (making the least expensive

share class easily available) and the investment options' role as the default investment.  There

can be no excuse for this apparent breach of fiduciary duty and, again, all of this information was

known and/or available to Defendants each and every year during the pertinent period when they

maintained these costly and unreasonable investment options in the Plan.

83.   ***The Dodge & Cox Stock Mutual Fund (DODGX).***  Despite an expense ratio of

52 basis points (.52%), as of December 31, 2014, this mutual fund only outperformed the S&P

500 in the three- and five-year benchmark.  Moreover, the .13% differential between the five-

year bench mark – 15.57% return as opposed to the S&P 500's 15.46% return – is mooted by the

expense ratio, which would make the actual 15.05% return on this mutual fund lower than the

S&P 500's return.  Meanwhile, the expense ratios of comparable Vanguard mutual funds are

much lower, ranging from 16 basis points (.16%) (Vanguard High Dividend Yield Index Fund

Investor Shares), 17 basis points (.17%) (Vanguard Equity Income Fund Admiral Shares), 26

basis points (.26%) (Vanguard U.S. Value Fund and Vanguard Windsor II Fund Admiral Shares),

to 29 basis points (.29%) (Vanguard Windsor Fund Admiral Shares).  All of this information was

known and/or available to Defendants each and every year during the pertinent period when they

maintained this costly and unreasonable investment option in the Plan.

84.   ***The SSgA S&P 500 Index NL-A Common Trust.***  This Common Trust was the

only index option available to the Plan until the switch to Vanguard was made -- yet it still

somehow underperformed the S&P 500 for every benchmark year, with a dramatic 87 basis

points (.87%) for the 10-year/inception benchmark. Meanwhile, its expense ratio of 16 basis

points (.16%), is more than three times more than that of the 5 basis points (.05%) expense ratio

for Vanguard 500 Index Fund Admiral Shares, which more closely tracks the S&P 500.  All of

this information was known and/or available to Defendants each and every year during the

pertinent period when they maintained this costly and unreasonable investment option in the Plan.

85.     Moreover, the Common Trust's mutual fund counterpart, SsgA S&P 500 Index Fund, tracked the S&P 500 more closely than the Common Trust while levying an expense ratio of 15 basis points (.15%), which is lower than that of the Common Trust.  These facts suggest either (a) the performance quoted to the Plan's participants in the 2013-2014 Financials is wrong; (b) an additional fee has been imposed on the Common Trust, which reduced the past net performance; or (c) the Common Trust was mismanaged.  All of this information was known and/or available to Defendants each and every year during the pertinent period when they maintained this costly and unreasonable investment option in the Plan.

86.     ***Wells Fargo Advantage Large Cap Growth-Inst Mutual Fund (STNFX).***  This mutual fund underperformed every period compared to its benchmark.  Meanwhile, with an expense ratio of 79 basis points (.79%), this mutual fund charged approximately 70 basis points (.70%) more than its Vanguard counterpart, the Vanguard Growth Index Fund Admiral Shares, which had an expense ratio of 9 basis points (.09%) for that same period.  All of this information was known and/or available to Defendants each and every year during the pertinent period when they maintained this costly and unreasonable investment option in the Plan.

87.     ***RS Small Cap Value Portfolio SMA.***  This SMA significantly underperformed compared to its benchmark, having a -2.29% return, while the Russell 2000 Value benchmark had a return of 4.44%.  Meanwhile, with an expense ratio of 89 basis points (.89%), this SMA charged approximately 80 basis points (.80%) more than its Vanguard counterpart, the Vanguard Small Cap Value Index Fund Admiral Shares, which had an expense ratio of 9 basis points (.09%) for that same period.  All of this information was known and/or available to Defendants each and every year during the pertinent period when they maintained this costly and unreasonable investment option in the Plan.

**5.      JPMCB's Conflicted Roles**

88.     Under the Master Trust, JPMCB (or the current trustee) determines the value of the Common Trust assets held in the Master Trust based upon the value stated by the trustee of the Common Trust, *i.e.*, JPMCB (or the current trustee).  In other words, Defendants tasked the trustee with confirming the value of its own Common Trusts, an obviously profound conflict-of-interest which is especially dangerous, as these Common Trusts are unregistered and not publicly-traded.

89.     Indeed, as the Common Trusts are unregistered and not publicly-traded and the audit scope was limited, it is impossible to independently determine if the trustee overvalued the Common Trusts for its own benefit or engaged in other violations of applicable law.  And, Defendants themselves have no basis to evaluate whether any such violations occurred which, in and of itself, amounts to a breach of a fiduciary duty.

**6.      Aon's Role As Investment Adviser**

90.     As the fiduciary investment adviser to the Plan, Aon regularly interacted with the other Defendants and made recommendations with respect to the investments to be offered to the participants in the Plan.

91.     Throughout the pertinent period, Aon offered little more than boilerplate investment advice in which it generally rubber-stamped the recommendations of JPMCB, while failing to offer meaningful advice regarding available investment alternatives or investment strategies.  Instead, Aon's persistent and relatively consistent "advice" was to retain the existing investments in the Plan, which explains, in part, the small number of changes in the Plan's investment line-up during the pertinent period.

92.     Even when JPMCB itself provided opportunities for fund changes to lower fees, although Aon presented those changes to the other Defendants, it engaged in no significant effort to persuade the other Defendants to fulfill their fiduciary duties by substituting out an underperforming and expensive investment for a better performing and less expensive investment alternative.  Rather, despite its fiduciary duties, Aon generally followed the lead of

JPMCB and, for the most part, recommended that the other Defendants do little or nothing to improve the investments offered by the Plan and the expenses paid by the Plan and its participants.  As noted above, Aon also implicitly endorsed an active management investment philosophy, while offering no information to Safeway and the Benefits Plan Committee regarding the potential wisdom of passive management with respect to investments and the prudence of offering low-cost, passively managed investments so that participants had such investment alternatives available to them.

93.      Despite its fiduciary duties, like the other Defendants, Aon also engaged in virtually no meaningful benchmarking or other studies during the pertinent period to evaluate whether the fees and expenses paid by the Plan were fair and reasonable and whether there were better service providers or investment options available to the Plan.  Indeed, Aon essentially took no meaningful or comprehensive actions until it learned that the Plan was likely moving from Empower to Vanguard in 2016.  The failure of Aon and the other Defendants to evaluate the fees and expenses of the available investment options throughout the pertinent period was a breach of fiduciary duty.

94.      In light of the advice provided by Aon and the lack of meaningful fiduciary services provided by Aon, the fees charged by Aon to the Plan (and which the other Defendants permitted to be paid to Aon) were rendered excessive and unreasonable.

## V.   ERISA'S FIDUCIARY STANDARDS

95.      ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  29 U.S.C. §1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and -
>
> (A)      for the exclusive purpose of
>
>    (i)      providing benefits to participants and their beneficiaries;
>             and
>    (ii)      defraying reasonable expenses of administering the plan;
>
> [and]

> (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

96.   Under 29 U.S.C. 1103(c)(l), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

97.   Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

98.   ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.

99.   ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)   if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

100.   29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a)

provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

101.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually, on behalf of the Plan, to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

## VI.   CLASS ACTION ALLEGATIONS

102.    This action is brought as a class action by Plaintiff on behalf of herself, proposed Class Representative Lorenz, and the following proposed class ("Class")

**Class**

> All current and former participants and beneficiaries of the Safeway 401(k) Plan at any time on or after July 14, 2010 through and including July 28, 2016 ("Class Period"), including any Beneficiary of a deceased person who was a Participant in the Plan at any time during the Class Period, and any Alternate Payees, in the case of a person subject to a Qualified Domestic Relations Order who was a Participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge(s) to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

103.    This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

104.    **Numerosity**.  Plaintiff and Lorenz are informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

105.    **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiff and Lorenz, and all the members of the Class, including, but not limited to the following:

(a)     whether Defendants failed and continue to fail to discharge their duties
with respect to the Plan solely in the interest of the Plan's participants for
the exclusive purpose of providing benefits to participants and their
beneficiaries;

(b)     whether Defendants breached their fiduciary duties under ERISA by
failing to defray the reasonable expenses of administering the Plans; and

(c)     whether and what form of relief should be afforded to Plaintiff, Lorenz,
and the Class.

106.   **Typicality**.  Plaintiff, and Lorenz,  who are  members of the Class,  have claims
that are typical of al of the members of the Class.  Plaintiff's claims and Lorenz's claims and all
of the Class members' claims arise out of the same uniform course of conduct by Defendants and
arise under the same legal theories that are applicable as to all other members of the Clas.

107.   **Adequacy of Representation**.  Plaintiff and Lorenz will fairly and adequately
represent the interests of the members of the Class.  Plaintiff and Lorenz have no conflicts of
interest with or interests that are any different from other members of the Class.  Plaintiff and
Lorenz have retained competent counsel experienced in class action and other complex litigation,
including class actions under ERISA.

108.   **Predominance**.  Common questions of law and fact predominate over questions
affecting only individual Class members, and the Court, as well as the Parties, will spend the vast
majority of their time working to resolve these common issues.  Indeed, virtually the only
individual issues of significance will be the exact amount of damages recovered by each Class
member, the calculation of which will ultimately be a ministerial function and which does not bar
certification.

109.   **Superiority**.  A class action is superior to all other feasible alternatives for the
resolution of this matter.  The vast majority, if not all, of the Class members are unaware of
Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring

suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

110.   **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

111.   Prosecuting separate actions would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests, because this action involves Defendants' plan-wide conduct. Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution, along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

<u>**COUNT I**</u>
**(For Breach Of Fiduciary Duty)**

112.   Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

113.   Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A),(B) and (C), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that

a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

114.    As a direct result of Defendants' breaches of duties, Plaintiff, Lorenz and the Plan have suffered losses and damages.

115.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

**COUNT II**
**(In The Alternative, Liability For Knowing Breach Of Trust)**

116.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

117.    In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a breach of trust.

118.    To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of poor and expensive investment options that cannot be justified in light of the size of the Plan and the other expenses of the Plan.

WHEREFORE, Plaintiff, and Lorenz, on behalf of themselves, the Plan, and all other

Plan participants demand judgment against Defendants, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which Plaintiff, Lorenz, and the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Second Amended Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: September 13, 2019                    Respectfully submitted,

SHEPHERD, FINKELMAN, MILLER
   & SHAH, LLP

*/s/ Kolin C. Tang*
Kolin C. Tang
Ronald S. Kravitz
Shepherd Finkelman Miller
   & Shah, LLP
201 Filbert Street, Suite 201
San Francisco, CA 94133
Telephone: (415) 429-5272
Facsimile: (866) 300-7367
Email: rkravitz@sfmslaw.com
          ktang@sfmslaw.com

James E. Miller
Laurie Rubinow
Shepherd Finkelman Miller

& Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
        lrubinow@sfmslaw.com

Nathan Zipperian
Shepherd Finkelman Miller
& Shah, LLP
1625 N. Commerce Pkwy, Suite 320
Fort Lauderdale, FL 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
Email: nzipperian@sfmslaw.com

Monique Olivier
Olivier Schreiber & Chao, LLP
201 Filbert Street, Suite 201
San Francisco, CA 94133
Telephone: (415) 433-0333
Facsimile: (415) 449-6556
Email:  monique@dplolaw.com

Sahag Majarian
Law Offices of Sahag Majarian
18250 Ventura Blvd.
Tarzana, CA 91356
Telephone: (818) 609-0807
Facsimile:  (818) 609-0892
Email: sahagii@aol.com

***Attorneys for Plaintiff, the Plan,
and the Class***

-38-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2019, I electronically filed the foregoing Second Amended Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

_s/ Kolin C. Tang_____
Kolin C. Tang

-39-